

**LODGED**
CLERK, U.S. DISTRICT COURT

**1/18/22**

**CENTRAL DISTRICT OF CALIFORNIA**
BY: _____ KMH _____ DEPUTY

Kent T. Hutke Fields
Principal Chief of the Natchez Tribe
P.O. BOX 484,
Gore (at Notchietown), OK 74435
(918)-489-5244
natcheznation@ymail.com

NO-
CV30

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE NATCHEZ NATION, A BAND OF THE FEDERALLY RECOGNIZED MUSCOGEE (CREEK) NATION,<br><br>PLANTIFFS,<br><br>v.<br><br>DEPARTMENT OF CHILDREN AND FAMILY SERVICES, STEFF PADILLA, IN HER OFFICIAL CAPACITY AS PRESIDING COMMISSIONER, DEPUTY COUNTY COUNSEL, JOSEPH ROBERT ESCOBOSA, IN HIS OFFICAL CAPACITY AS ATTORNEY, CHILDREN'S LAW CENTER, HEATHER ANN STARMAN, IN HER OFFICIAL CAPACITY AS ATTORNEY, CHILDREN'S LAW CENTER, YVONNE MASSAIS-JOBY, IN HER OFFICIAL CAPACITY AS ATTORNEY<br><br>DEFENDANTS | Case No.: 2:22-cv-00396-UA<br><br>**MOTION FOR PRELIMINARY INJUNCTION; POINTS AND AUTHORITIES;**<br><br><br><br>**DATE:**<br>**TIME:**<br>**COURTROOM:** |

This Motion is made pursuant to Federal Rule of Civil Procedure 65 and Local Rule 65-1 and is based on the accompanying Memorandum of Points and Authorities. The Petition challenges the request to allow the Lanam minors unsupervised visits, by Deputy County

Counsel, Joseph Robert Escobosa and the minors Counsels, Heather Ann Starman (Attorney for S.L.) and Ashley Hylton (attorney for R.L.), approved by Commissioner Steff Padilla.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    INTRODUCTION

Plaintiff moves this Court for entry of a Preliminary Injunction preventing the Defendants from continuing unmonitored visits between minors R.L. and S.L., with the abuser/adoptive mother Margaret Rose Lanam. The Natchez Nation, a band of the Muscogee (Creek) Nation (See Exhibit 1: Affidavit of Muscogee National Council), a Tribe which holds multiple treaties with the United States of America, through its counsel, bring this action against the Defendants Department of Children and Family Services, Steff Padilla, in her official capacity as Commissioner, Joseph Robert Escobosa, in his official capacity as Attorney (Deputy County Counsel for DCFS), Heather Ann Starman (attorney for S.L.) and Yvone Massais-Joby (attorney for R.L.) in their official capacities as Attorney's (appointed by the Children's Law Center).

This Motion is made on the following grounds:

1.  The State of California violated notice requirements of the Indian Child Welfare Act by failing to send notice to the Tribe of Child Custody Proceedings for an Indian Child (ICWA-030), termination of parental rights, placement hearings, and adoption by registered mail with return receipt requested between 2012 and 2014.

2.  The great grandmother, Susan Elizabeth Turner Williams is an enrolled member of the Natchez Nation and of Cherokee descent. The Juvenile Court and DCFS failed to Notice the maternal family of Child Custody Proceedings for an Indian Child (ICWA-

030), termination of parental rights, placement hearings, and adoption between 2012 and 2014.

3. The Tribe will suffer irreparable injury in the absence of a preliminary injunction because Defendants have undermined and infringed upon the sovereign rights of the Tribe to intervene on behalf of their eligible Indian children, violated the federal laws of ICWA, continue to hold hearings without notice being sent to the Tribe and continue in the dangerous practice of allowing unmonitored visits between the Native American minors and adoptive mother; despite the tantamount evidence detailing the dangers to the safety and wellbeing of the eligible Indian minors mentally, emotionally and physically.  Defendants show no signs of ceasing these practices, which is of immediate concern due to the recklessness and instability of the adoptive mother, Margaret Rose Lanam, and the lifelong psychological consequences from the childhood trauma the Native American children have previously and are currently sustaining as a direct result of the Defendants disregard to for the minors' safety and wellbeing and the Tribe.

4. The balance of hardships weighs decidedly in the Tribe's favor, as our children have been taken from us unaware, stripped of their language and culture, subjected to inhumane treatment at the hands of the adoptive mother, her staff, nannies, and others. Furthermore, the sovereignty of the Tribe has been disregarded and the integrity of native families and the stability within our community undermined.

5. The public interest strongly favors the issuance of a preliminary injunction in these circumstances, as Defendants continue to violate the rights of the minors to be protected from the abuser/adoptive mother, disregard their safety and wellbeing by

allowing unmonitored visits, violate the rights of the Natchez band of the Muscogee (Creek) Nation to intervene on behalf of our Native children, and the federal laws of ICWA, because it promotes the interest of justice.

## STATEMENT OF FACTS

When minor, R.L. born 2011, was three months old, she was taken into custody from the biological mother, Amanda Sue Turner, who was residing in a woman's shelter in Riverside County. The minor was remanded into custody due to the instability of mother. The paternal family was notified that the minor was currently in custody and requested that the minor be placed in the home of the paternal grandmother. However, Riverside County DCFS declined the request due to false information that the grandmother's address was the biological father's place of residence. Furthermore, biological mother was unwilling to have the minor placed with paternal family, even though minor had resided with the paternal family regularly since birth.

Riverside Juvenile Court and DCFS were aware that the minors were of Native American descent. The biological great grandmother is an enrolled member of the Natchez Nation and is eligible for enrollment in the Cherokee Tribe. Furthermore, the maternal aunt, uncle and cousins are an enrolled members of the Morongo Tribe and were living on the reservation at the time the minor was detained by DCFS. The minors were placed with a foster parent, Margaret Rose Lanam, who falsely informed the Court that she was a relative- cousin, however, the paternal family notified the Court that the foster mother had perjured herself. Nevertheless, Riverside County proceeded with the adoption, finding that the minors were not of Native American descent. Ms. Lanam adopted R.L. and S.L., formerly I.E. and N.E. respectively, in late 2014.

No ICWA notice of placement nor adoption were ever sent to the maternal family, the Natchez Nation, nor the Muscogee (Creek) Nation. The maternal great grandmother is an enrolled member of the Natchez Nation and eligible for enrollment in the Cherokee Nation.

On or before minors, R.L. and S.L. were adopted out by Riverside Juvenile Court despite having information from biological mother, Amanda Sue Turner, that the minors were of Native American descent. Maternal grandmother, Susan Elizabeth Turner Williams, is a registered member of the Natchez Nation, a band of the Muscogee (Creek) Nation. Furthermore, the maternal aunt, Sally Turner, is an enrolled member of the Morongo Tribe and was living on the reservation at the time the minor was detained from biological mother.

The Natchez Tribe first learned of the minors in May of 2021 when maternal grandmother and enrolled member, Susan Williams, contacted the Tribal Chief on May 5, 2021, seeking Tribal intervention on behalf of her eligible Indian great grandchildren.

The Department of Children and family Services (hereafter DCFS) filed a petition requesting the juvenile court adjudge minors referred to as R. L. and S. L. to be within the jurisdiction and to declare them dependent children. The petition alleged, inter alia, that R. L. and S. L. are in danger of physical or sexual abuse and there are no reasonable means by which the children can be protected without temporary removal from the physical custody of the parents or guardians; and the children's physical environment poses a threat to the children's health and safety and there are no reasonable means by which the children can be protected without temporary removal from the physical custody of the parents or guardians. The adoptive mother, Margaret Rose Lanam, had the minors living in an Intermediate Care Facility Developmentally Disabled Habilitative Facility, also known as an ICF/DD-H, for adults. The ICF/DD-H is known as Chelsea Home Health Care located at 6122 South Victoria Avenue, Los

Angeles, CA 90043, is a facility licensed by the Department of Health and funded by the South-Central Los Angeles Regional Center (SCLARC). There are approximately seven clients in the facility, and they have a wide range of mental health disabilities ranging from schizophrenia to psychosis.

On July 19th, 2021, the minors were found residing at adoptive mother's place of business- a nursing home facility for adults- and were detained by DCFS, per removal order by the Court. The Detention Hearing was held on July 26, 2021, and the Court impliedly sustained the petition, effectively finding true the allegations of serious physical harm against the minors by adoptive mother. It found by clear and convincing evidence that, in the physical custody of Margaret Rose Lanam, R. L. and S. L. faced substantial dangers to their physical health that could not be avoided by any reasonable means short of removal. Commissioner Padilla ordered the Tribe to make an oral motion to intervene and file proof of tribal recognition in the state of Oklahoma and file moving papers showing the legal basis for jurisdiction with attached points and authorities. On August 6, 2021, the Tribe submitted a Motion to Intervene, which included and affidavit from the Muscogee National Council (the equivalence of the US Supreme Court) acknowledging the Natchez Nation as a band of the Muscogee (Creek) Tribe. See Exhibit 1: Affidavit of Muscogee National Council.

DCFS's appointed Deputy County Counsel, Joseph Robert Escobosa, requested more time to review the "lengthy document." The hearing on August 10, 2021, was continued to September 1, 2021, and the Court allowed the Natchez Tribe to participate in further proceedings pursuant to Welfare and Institutions Code Section 306.6. Furthermore, the Court retained jurisdiction and ordered all discovery be circulated by October 18, 2021- the Trial Setting Conference, hereafter TSC. The TSC was continued to November 18, 2021. However, DCFS

refused to circulate any discovery, despite multiple requests from the Tribe. All attempts (of the Tribe and Tribal representatives) to speak with the appointed Counsels for the minors were rejected by the minors' counsels (Heather Ann Starman and Ashley Hytlon), as well as Deputy County Counsel Joseph Robert Escobosa. During the TSC hearing on November 18, 2021, Attorney for Margaret Lanam, Shirley Kenninger, requested unmonitored visits between the minors and abuser/adoptive mother: Deputy County Counsel, Joseph Robert Escobosa, agreed, as did both attorneys for the minors. However, it was soon discovered that Ashley Hylton, Counsel for the R.L., never spoke to minor and therefore perjured herself in Court when she stated that she'd spoken with the minor and that the minor wanted unsupervised visits with the abuser/adoptive mother. The Tribal attorney, Richard Green, objected to the unsupervised visits between the minors and the abuser/adoptive mother. Deputy County Counsel, Joseph Robert Escobosa, also requested a Mediation Setting Conference for the abuser/adopted mother on December 2, 2021. The Tribe was never notified of the hearing. Ashley Hylton was subsequently removed and Yvonne Massais- Joby replaced her as appointed Counsel for R.L.

In anticipation of one of the juvenile Court orders, DCFS placed the minors with a suitable foster family. However, throughout the course of the hearings, adoptive mother, repeatedly harassed the foster families and associated social workers, causing the children to be removed and placed in 5 different homes over the course of 4 months. Furthermore, minors' initial appointed counsel, David Malleis Barton, requested copies of the videos, audios and text messages detailing the horrific abuse the minors have sustained during multiple hearings. However, Deputy County Counsel, Joseph Robert Escobosa, refused to send the evidence to Attorney Malleis.

1

## II.    **ARGUMENT**

2

3        The Indian Child Welfare Act (ICWA) of 1978 is a federal law that regulates the

4    removal and out-of-home placement of American Indian children. The Act establishes minimum

5    federal standards that must be met in any legal proceeding to place an Indian child in a foster or

6    adoptive home, and it ensures that Indian tribes and families are allowed to participate in such

7    Indian child welfare cases. See 25 U.S.C. § 1901 et seq. Congress enacted ICWA after finding

8    "that an alarmingly high percentage of Indian families are broken up by the removal, often

9    unwarranted, of their children from them by nontribal public and private agencies and that an

10   alarmingly high percentage of such children are placed in non-Indian foster and adoptive homes

11   and institutions"; "that the States, exercising their recognized jurisdiction over Indian child

12   custody proceedings through administrative and judicial bodies, have often failed to recognize

13   the essential tribal relations of Indian people and the cultural and social standards prevailing in

14   Indian communities and families"; and "that there is no resource that is more vital to the

15   continued existence and integrity of Indian tribes than their children and that the United States

16   has a direct interest, as trustee, in protecting Indian children who are members of or are eligible

17   for membership in an Indian tribe."

18

19        The Tribe never received any Notices on the minors regarding removal,

20   placement, termination of parental rights, nor adoption between 2012 and 2014 from neither

21   Riverside Juvenile Court and Riverside County DCFS, nor any of their representatives. Indian

22   tribes have an interest in the child, which is distinct from, but on a parity with the interest of the

23   parents. *Miss. Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 52 (1989) (quoting from *In re*

24   *Halloway*, 732 P.2d 962, 969-70 (Utah 1986)). Notice to the tribe also gives the tribe the

25   opportunity to ensure compliance with the placement preferences of 1915. *Cf. In re Baby Boy C.*,

26   MOTION FOR PRELIMINARY INJUNCTION; POINTS AND AUTHORITIES; DATE:TIME:COURTROOM:  -

27   8

28

1

2

3

4

5

6

7

8

9

10

11

805 N.Y.S.2d 313 (App. Div. 2005). The Act requires notice of the pending proceedings and the

right of intervention of the parents, Indian custodian, and the Indian childs tribe. 25 U.S.C.

1912(a). The Guidelines specify what information should be included in the notice. Indian Child

Custody Proceedings, 44 Fed. Reg. 67,584, 67,588 (Bureau of Indian Affairs Nov. 26, 1979)

(guidelines for state courts). Notice to one tribe does not protect the interests of a tribe not given

notice, so all tribes in which the minor may be eligible for enrollment must be notified. In re

Desiree F., 99 Cal. Rptr. 2d 688 (Ct. App. 2000). Indian tribes and extended family members

have substantial rights under the ICWA. The lack of notice to the Tribe prevented the Tribe from

identifying whether there are good tribal or family placements available for the children.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

The State violated notice requirement of Indian Child Welfare Act by making no

attempt to send notice of parental rights termination hearing to Tribe by registered mail, despite

knowledge that the minors were of Native American descent. Indian Child Welfare Act of 1978,

§ 102, 25 U.S.C.A. § 1912. Also, the Juvenile Court erred in their finding that the Natchez

minors were not Indian. In any child custody proceeding listed in rule 5.480, the court may not

order placement of an Indian child unless it finds by clear and convincing evidence that

continued custody with the parent or Indian custodian is likely to cause the Indian child serious

emotional or physical damage and it considers evidence regarding prevailing social and cultural

standards of the child's tribe, including that tribe's family organization and child-rearing practices.

The Tribe was denied due process of law because the Juvenile Courts and Riverside County

DCFS failed to perform active efforts, even though DCFS and the lower Court were aware that

the minors were of Native American descent.

26

27

28

The Tribe's eligible Native American children have suffered irreparable damages

due to the lower Court err in judgement in placing the minors with Margaret Lanam. The minors

have been physically, verbally, and emotionally abused by the adoptive mother, Margaret Rose Lanam, her daughter, Regine Lanam Patterson, her grandson, A.P., her nursing home staff, nannies, a nanny's spouse. The minors were forced to live in an Intermediate Care Facility for the Developmentally Disabled Habilitative (hereafter ICF/DD-H), which is a facility for mentally disabled adults (located in Los Angeles), funded by the South-Central Los Angeles Regional Center and overseen by the Department of Public Health. The minors reported being forced to sleep with the clients in the facility as punishment. In one video R.L. stated that the client urinated on her while they "were sleeping in the bed" together. The minors also reported being beaten with hangers, belts, brushes combs, being choked, thrown into walls, hit in the head with a variety of objects including iPads, wooden spoons, and spatulas, stabbed with pencils, hit with rulers, slapped in the face, forced to sleep with the nanny's husband and drugged for financial gain. The children sent following text messages:

S.L. "Mommy's about to kill me."

S.L. "Aunt mom sending me away. Pls she sending me to adoption center."

S.L. "Aunty mommy is sending me to a mental hospital."

R.L.: "I dont wanna leave.

Respondent: You don't want to leave where?

R.L. She just yelled, "I'M GONNA MURDER YOU BOTH."

R.L. TO HEAVEN

R.L. "pick me up and never let me see my mom again and call the police please.

The nursing home staff have been investigated on multiple occasions due to claims of child abuse.

S.L. reported having to sleep with the nanny's husband and informed the recorder that she slept with him and "he had his shirt off and rubbed his boom booms on me."

Furthermore, Ms. Lanam should never have been allowed to adopt the minors in the first place. The adoptive mother was arrested in 1994 for assaulting her biological daughter, Regine Lanam Patterson, in front of a police officer.

The Tribe's Native American children have spent the entirety of their lives being manipulated, abused, neglected, and assaulted by the adoptive mother and her cohorts. Furthermore, Ms. Lanam falsified documents submitted during the initial adoption and informed the Juvenile Court that she is a paternal cousin. The family has notified the current Court that not only is Ms. Lanam not a cousin, but she also continues to purport the lie.

Commissioner Padilla's decision to provide unmonitored visits was based on perjurious information provided to the Court by Ashley Hylton, Attorney for R.L. Ashley Hylton, at the time of the November 18, 2021, Court hearing; had never seen nor spoken to the minor, however, she falsely informed the Court that she had indeed conversed with R.L. and it was R.L.'s desire to "have unsupervised visits" with the abuser/adoptive mother. When this information was brought to the attention of the Children's Law Center, Ms. Hylton was immediately removed from the case and replaced by Yvonne Massais- Joby. This was not only a matter of misrepresenting facts within a Court law, but a violation of the trust the minor placed in her attorney to protect her interest, as opposed to that of DCFS and the abuser/adoptive mother. It was also a violation of the minors' wellbeing and safety to place them back in the hands of an individual with a history of child abuse.

The Natchez Tribe is a band of the Muscogee (Creek) Tribe, and the juvenile Court violated the Tribe's treaty rights which upholds the juvenile codes pertaining to the Native

American children. The legal constitutional rights of the children have also been violated by DCFS's and the minors' respective attorneys attempts to circumvent the Tribe and treaties of the sovereign nation, the laws of the Muscogee (Creek) Nation, and the federal Laws of ICWA. In doing so, the safety and wellbeing of our children is being jeopardized by DCFS and the State of California by their wanton and reckless disregard of the eligible Native American minor's safety, security, and wellbeing of the minors. Therefore, the lower Court lacks jurisdiction to hear this case because it concerns a sovereign nation and federal entity equal to and with the United of America. The Constitution recognizes the existence of Indian tribes and, in many respects, treats them as sovereigns in the same manner as the states and foreign nations. See U.S. CONST. art. I, § 8, cl. 3 (empowering Congress "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes"); Holden v. Joy, 84 U.S. 211, 242 (1872)

Indian tribes possess "inherent powers of a limited sovereignty that has never been extinguished." Id. Because of tribes' retained sovereignty, they have a government-to-government relationship with the United States. Id. Second, the federal government has expansive and exclusive powers in Indian affairs, and, relatedly, an ongoing obligation to use those powers to promote the wellbeing of the tribes in what is commonly referred to as a trust relationship. Id. Third, as a corollary to the federal government's broad power in Indian affairs, the supremacy of federal law, and the need for the nation to speak with one voice in its government-to-government relations, state authority in this field is very limited. Id.

Adoptive mother, Margaret Rose Lanam, is incapable of caring for the minors and inflicted serious bodily injury and harm to both minors; and the grotesque abuse has continued for years. Minors were subjected to live in a nursing home with mentally disabled adults, an environment which is neither safe for the wellbeing of the children nor the clients within the

business entity. On July 19, 2021, a Los Angeles Superior Court Judge ordered that the children be removed and transferred to foster care. In August 2021, the Tribe, became aware of the current court proceedings. Since that time, the Tribe has been present and active at all hearings it received notice for. It is evident that the continuance of unmonitored visits with the abuser is contrary to the childrens welfare. More importantly, the Tribe, DCFS, the family and even these young Native children have yet to comprehend the lifelong trauma that these children will experience as a results of a flawed justice system.

### III.    CONCLUSION

For the foregoing reasons, The Tribe respectfully request that this Court enter a preliminary injunction to bar Defendants from further allowing unmonitored visits between the Native American minors and the abusive adoptive mother, Margaret Rose Lanam, and preventing further emotional and mental trauma on the minors, until such a time as this matter can be tried.  The eligible Native American minors were removed on July 19, 2021, from adoptive mother, Margaret Rose Lanam. The Tribe previously believed that the lower Court and DCFS would issue rulings in the interest of the safety and wellbeing of the Native American minors and the Tribe.

However, the Tribe has been repeatedly denied due process of law, our children, R.L. and S.L. have failed to receive adequate protection from their appointed counsels, DCFS, and lower Court, and the children's safety and wellbeing was not considered when the Court decided to allow liberalized visits with the abuser/adoptive mother. The Juvenile Court infringed on the sovereign right of the Natchez Nation. The Tribe retains the best interests of our children existing and DCFS has failed to adequately protect the children's best interests. More importantly, the children have been severely abused and suffered childhood trauma and exposure to violence

mentally, emotionally, and physically. The Natchez Nation has been denied due process of law.

The adjudication hearing is set for Wednesday, February 9, 2022, in Edmund Edelman

Courthouse and the Tribe prays this Court makes a ruling as soon as possible.

        Dated this 10th of January 2022.

                  Kent T. Hutke Fields, MSW
                  Petition, In Pro Per

# EXHIBIT 1



**AFFIDAVIT**

I, Wilbur (Chebon) Gouge, do hereby affirm THAT:

The Muscogee (Creek) Nation Placement Preferences Act, NCA 92-125, was signed into law by the Principal Chief Bill Sunday Fife on the first day of September, 1992, specifically identifying the Natchez Nation as a member tribe of the Muscogee (Creek) Nation. Further, that this legislation has not been amended.

The Comprehensive Juvenile and Family Codes of the Muscogee (Creek) Nation, NCA 92-119, were signed into law by Principal Chief Bill Sunday Fife on the seventh day of October, 1992, specifically identifying within the Procedure and Protocol Section, that "Any cultural or tribal common-law remedy not specifically referred to herein is to be given full consideration and weight in the proceedings of the Court of the Muscogee (Creek) Nation. Further, that this legislation has not been amended.

Under definitions in the Comprehensive Juvenile and Family Codes of the Muscogee (Creek) Nation, and "Juvenile Court" means the Juvenile Division of the Muscogee (Creek) Nation Court System, OR the Juvenile Court or C.F.R. Court established for other Indian tribes, or a state Juvenile Court as is appropriate from the context."

Under The Constitution of the Muscogee (Creek) Nation, Article II, Section 5, "This Constitution shall not in any way abolish the rights and privileges of persons of the Muscogee (Creek) Nation to organize tribal towns or recognize its Muscogee (Creek) Traditions." Further that the Muscogee (Creek) Constitution has not been amended and that the Natchez Nation, is historically and by treaty signatures with the United States of America, a member tribe of the Muscogee (Creek) Nation.

Wilbur Gouge, Speaker
Muscogee (Creek) National Council

Subscribed and sworn to before me this 16th day of July, 2001 at Okmulgee, Oklahoma.

Notary Public

11-04-02

My Commission Expires

1  Thomasina Reed, ESQ.
2  5777 West Century Blvd.
   Los Angeles, CA 90045
3  (310)-869-8261
   Reedthomasina5@gmail.com
4
                    EDMUND D. EDELMAN COURTHOUSE
5
                              JURISDICTION
6
7  In the matter of:                    Case No.: 21CCJP03385A

8
9  Rihanna Lanam and Sasha Lanam         MOTION TO INTERVENE AND
                                         MEMORANDUM OF POINTS AND
                                         AUTHORITIES REGARDING NATCHEZ
10                                       NATION ELIGIBILITY TO INTERVENE AND
                                         TRIBAL JURISDICTION IN THE CASE OF THE
11         Minors                        MINORS

12                                       DATE: AUGUST 10, 2021
                                         TIME: 8:30 A.M.
13                                       DEPT: 421

14

15                                **BACKGROUND**

16
17      Rihanna Margaret Lanam (9/9/2011) and Sasha Rose Lanam (10/10/2012), formerly Iyanna

18  Elizabeth Ebow and Na'siya Sereen Ebow, respectively, were born to Amanda Sue Turner (of Creek

19  (Natchez), Choctaw and Cherokee descent) and Ian Irwin Ebow (of Cherokee, Chickasaw, and

20  Cheyenne descent). The minor Rihanna was taken into DCFS custody from mother (Amanda), who

21  resided alone in Riverside County, and initially placed with a foster mother Sheila (last name

22  unknown), prior to placement with Ms. Lanam. Sasha was taken from the hospital three days after

23  birth and placed with Ms, Lanam as well. Riverside DCFS claimed Rihanna was "abused," however,

24  the Pediatrician, Dr. Albury, who oversaw Rihanna's care (for all four months prior to the child's

25
26  detention) deemed Rihanna "a healthy baby". (See attached Exhibit 1- Letter from Dr. Albury)

27                                        - 1 -
          MOTION TO INTERVENE AND MEMORANDUM OF POINTS AND AUTHORITIES REGARDING
28   NATCHEZ NATION ELIGIBILITY TO INTERVENE AND TRIBAL JURISDICTION IN THE CASE OF THE
          MINORSDATE: AUGUST 10, 2021TIME: 8:30 A.M.DEPT: 421

Riverside DCFS never contacted nor considered the maternal nor paternal families for placement of either child. The paternal grandmother's request for placement was denied on the grounds that minors parents resided within the domicile; however, this was proven to be false.  In 2013, Caroline Yetman, paternal Aunt, procured legal counsel, Andrea Tytell, for placement of the children. Ms. Tytell sent the DCFS social worker, Letisha Bragger, and the attorney's involved in Case no. RIJ200191 a letter on December 5, 2013, stating that Counsel identified several ancestors of the paternal and maternal families who were registered members of the Choctaw and Chickasaw Tribes; and requested more time to investigate the Indian heritage of the eligible native American children. (See attached Exhibit 2 A- Letter from Attorney Andrea Tytell) The request was denied. On February 1, 2014, the paternal Aunt contacted Lisa Raigspraw, DCFS Supervisor to outline the injustices mete out to her at the hands of social worker, Letisha Bragger and her supervisor, Ben Brandon, to inform her that "children had been permanently". (See attached Exhibit 2 B- Letter to Lisa Raigspraw, DCFS Supervisor) Despite earnest attempts to have the children placed with her, Riverside DCFS denied all request. (See attached Exhibit 2 C-DCFS Potential Caregiver Response Letter) The request of a nonrelative (Margaret Rose Lanam- holding no relation whatsoever by blood, marriage, adoption or otherwise) was instantly approved by Riverside DCFS, thereby ignoring the law, and bypassing the biological family with known Native ancestry. Furthermore, multiple reports of abuse were made about the adoptive parent, Margaret Lanam's, treatment of the minors, but no action was taken by Riverside County DCFS. Riverside County has a history of failing to adequately investigate adoptive parents. (See attached Exhibit 2 D- LA Times articles on Riverside DCFS)

The maternal grandmother and tribally appointed Indian Custodian, Susan Elizabeth Williams Turner has adopted children in Riverside and Los Angeles County since the 1990's,

MOTION TO INTERVENE AND MEMORANDUM OF POINTS AND AUTHORITIES REGARDING NATCHEZ NATION ELIGIBILITY TO INTERVENE AND TRIBAL JURISDICTION IN THE CASE OF THE MINORSDATE: AUGUST 10, 2021TIME: 8:30 A.M.DEPT: 421

however, she was never notified about the Dependency Court hearings. (See Exhibit 3- Indian Custodian/Susan Turner's Declaration) Failure by Riverside DCFS and the Court to notify the Indian Custodian of any proceedings related to the minors, resulted in exclusion and the stolen opportunity to provide pertinent information about the Tribe that would immediately identify the minors as eligible Indian children. The Muscogee (Creek) Nation received no Notice whatsoever from the Courts, DCFS, attorney's nor any other parties associated with the minor's case. Riverside County Department of Children and Family Services violated federal laws by failing to complete diligent inquiry and give Notice to the Tribes and Bureau of Indian Affairs; thereby obstructing and precluding the Tribe's legal right to participate in court proceedings and violating placement preferences as outlined in ICWA. The minors have always been of Native ancestry and thus eligible Indian members of the Muscogee (Natchez) Tribe; however, DCFS social workers, attorney's and the Riverside Juvenile dependency Court made no active efforts to maintain or reunite the Indian descendants with their tribe, tribal relatives, or any other immediate/extended family member. And thus, the emergence of the common narrative: a denial of the civil rights that the ICWA and Cal-ICWA were meant to safeguard.

## STATEMENT OF FACTS

The Natchez Tribe is a Band Member Tribe of the Muscogee (Creek) Nation (hereinafter "Tribe") specially appears and moves this Court to accept the Motion to Intervene and Memorandum of Points and Authorities regarding tribal jurisdiction of the eligible Indian minors Rihanna Lanam and Sasha Lanam (hereinafter R.L and S. L). (See attached Exhibit 4 A: Affidavit from the Muscogee (Creek) Council- the Tribe's Supreme Court and Exhibit 4 B- Affidavit of Principal Chief) The Muscogee (Creek) Nation, a federally recognized Tribe, is one of the Five Civilized Tribes listed in

1   the Federal Register. (See 71 Fed. Reg. 7555 (January 29, 2021). The Indian Child Welfare Act of

2   1979 ("ICWA") 25 U.S.C. 1901 et seq. is federal legislation which preempts state law whenever an

3   Indian child may be removed from the child's family. The Act gives special protections to Indian

4   families, including higher evidentiary requirements, culturally appropriate reunification efforts, and

5   tribal intervention rights.

6

7           C.C.R. 5.481(c) states that if there is "reason to know an Indian child is involved in a

8   proceeding listed in rule 5.480… the social worker, petitioner, or in probate guardianship and

9   conservatorship proceedings, if the petitioner is unrepresented, the court, must send *Notice of Child*

10  *Custody Proceeding for Indian Child* (form ICWA-030) to the parent or legal guardian and Indian

11  custodian of an Indian child, and the Indian child's tribe, in the manner specified in Welfare and

12  Institutions Code section 224.3, Family Code section 180, and Probate Code section 1460.2 for all

13  initial hearings that may result in the foster care placement, termination of parental rights,

14  preadoptive placement, or adoptive placement, or an order of guardianship, conservatorship, or

15  custody under Family Code section 3041." The Muscogee (Creek) Nation has no record of the

16  minors nor their parents' names in their case management system, which would be present had the

17  Tribe received a Notice of Custody Proceedings for Indian Child (ICWA-030) form from the Court,

18  DCFS social workers or their attorney's. (See attached Exhibit 5: Letter from Muscogee (Creek)

19  Nation Child and Family Services Division) Under Rule 5.481(a) of the "California Rules of Court"

20  all parties associated with the "custody placement under Family Code section 3041" have an

21  "affirmative and continuing duty" to verify whether the minors are of Indian ancestry and give notice

22

23  to all potential Tribes involved. Once again, the Muscogee (Creek) Nation was never given notice.

24

25

26

27                                      - 4

28  MOTION TO INTERVENE AND MEMORANDUM OF POINTS AND AUTHORITIES REGARDING
    NATCHEZ NATION ELIGIBILITY TO INTERVENE AND TRIBAL JURISDICTION IN THE CASE OF THE
    MINORSDATE: AUGUST 10, 2021TIME: 8:30 A.M.DEPT: 421

Throughout ICWA child-custody proceedings, "active efforts" must be made "To the maximum extent possible…in a manner consistent with the prevailing social and cultural condition and way of life of the [eligible] Indian child's Tribe and should be conducted in partnership with the [eligible] Indian child and the [eligible] Indian child's parents, extended family members, Indian custodians and the Tribe." *25 C.F.R. §23.2, §23.120.* No active efforts were made by Riverside County DCFS, attorney's nor the Courts towards the parents, extended family, Indian Custodian or the Tribe. Pursuant to 25 U.S.C. § 1911(c). "In any State court proceeding for the foster care placement of, or termination of parental rights to, an Indian child, the Indian custodian of the child and the Indian child's tribe shall have a right to intervene at any point in the proceeding." *Id.* There are no mandatory timelines preventing formal intervention and intervention can even occur on appeal. (In re Baby Girl A., 282 Cal. Rprt. 105 (Ct. App. 1991) (certified for partial publication). It is incumbent on the State to enforce its legislative mandate and require equitable compliance with ICWA, with the same resources and accountability as any other civil rights mandate.

Riverside DCFS social workers, attorney's and the Court robbed the biological parents, the Indian Custodian, and the Tribe their ICWA rights by failing to give the Tribe, tribal relatives, and extended family members (paternal and maternal) proper Notice and preference during foster care placement, termination of parental rights, preadoption and adoption placement. Furthermore, "In any involuntary proceeding in a State court, where the court knows or has reason to know that an Indian child is involved, the party seeking the foster care placement of, or termination of parental rights to, an Indian child shall notify the parent or Indian custodian and the Indian child's tribe, by registered mail with return receipt requested, of the pending proceedings and of their right of intervention." 25 U.S.C. § 1912. Riverside DCFS choice to willfully withhold pertinent

- 5 -

MOTION TO INTERVENE AND MEMORANDUM OF POINTS AND AUTHORITIES REGARDING NATCHEZ NATION ELIGIBILITY TO INTERVENE AND TRIBAL JURISDICTION IN THE CASE OF THE MINORSDATE: AUGUST 10, 2021TIME: 8:30 A.M.DEPT: 421

information from the Pacific Region of the Bureau of Indian Affairs resulted in the current tragedy set before the Courts today- years of documented chronic physical, mental, verbal, and emotional abuse of R.L. and S.L. because the information was concealed.

## LEGAL AUTHORITY

The Court has requested Points and Authorities as to whether the Court has jurisdiction to make the orders that are being requested. Under CRC 5.481(a) all parties identified in the preceding rule have an "affirmative and continuing duty to inquire whether a child is or may be an Indian child in all proceedings." At any stage of the proceeding, once known or believed, that an Indian child or children are involved, the Court should dismiss the action in state court and allow proceedings to be pursued in Tribal Court. Once the Court and all DCFS related personnel and representatives became aware of fact that the case involved Indian minors, Riverside County (in accordance with the law) should have given the Muscogee (Creek) Tribe Notice of the children's Native American status. Petitioner contends that the Court has a continuing and affirmative duty to give notice to the Tribe at any stage during Court proceedings but failed to do so in this case.

Natchez Tribe is a Band Member Tribe of the original Muscogee (Creek) Nation. The Muscogee (Creek) Nation is a federally recognized Tribe comprised of a treaty-based alliance of tribal clans and bands. The Muscogee (Creek) Nation Placement Preferences Act, Section 104(c) states: "Clan or Band Members shall be defined as any such person, in this instance within the same tribe of the Muscogee (Creek) Nation (Thlopthlocco, Alabamu, Koasati, Yuchi, **Natchez**, or other tribe recognized by Muscogee (Creek) Nation." A tribe is defined as any Indian tribe, band, nation, or other organized group or community of Indians recognized as eligible for the services provided to

- 6

Indians by the Secretary because of their status as Indians including any Alaska Native village as defined in section 1602(c) of title 43 25 U.S.C. 1903(8). Federal recognition means that the United States government recognizes the right of an Indian tribe to exist as a sovereign entity; therefore, the Tribe is covered under the Federal umbrella of the Muscogee (Creek) Nation and retains the power to exercise its sovereign authority under ICWA law in the case of the eligible Indian minors, R.L. and S. L.

The Tribe signed several treaties between 1790 and 1900 with the United States Government (See Exhibit 6- Treaties the Muscogee (Creek) Nation have signed with the United States). Every treaty provided therein identifies the Tribe as "the whole Creek nation of Indians." Treaties are legally binding contracts between sovereign nations that establish those nations' political and property relations and their express rights. (See attached Exhibit 7 - Rights of Treaty Tribes). Article Six of the United States Constitution holds that treaties "are the supreme law of the land," with the same legal force and effect as federal statutes. Treaties bind both the federal government and the signing Indian Tribe or tribes and constitutes recognition of tribals rights and sovereignty. Like the Constitution and Bill of Rights, treaties do not expire with time.

The Tribe retains its jurisdiction, sovereignty, and authority as it exists within and as an inherent part of the Muscogee (Creek) Nation's and this is recognized in the Muscogee (Creek) Constitution. Article II, Sections 4 and 5 of the Muscogee (Creek) Constitution states the following: "4. This Constitution shall not affect the rights and privileges individual citizens of the Muscogee (Creek) Nation in their trust relationship with the United States of America as members of a federally recognized tribe. 5. This Constitution shall not in any way abolish the rights and privileges of persons

MOTION TO INTERVENE AND MEMORANDUM OF POINTS AND AUTHORITIES REGARDING NATCHEZ NATION ELIGIBILITY TO INTERVENE AND TRIBAL JURISDICTION IN THE CASE OF THE MINORSDATE: AUGUST 10, 2021TIME: 8:30 A.M.DEPT: 421

of the Muscogee (Creek) Nation to organize tribal towns or recognize its Muscogee (Creek)

traditions."

The Creeks are a sophisticated association of several Tribes, and the alliance became known

to early settlers as one of the "Five Civilized Tribes," which included the Tribes of Cherokee,

Chickasaw, Choctaw, and Seminole. The primary settlements of the Tribe are presently in the

southern half of the Muscogee (Creek) Reservation in Oklahoma. The Muscogee (Creek) Nation is

comprised of separate and sovereign towns, tribes, and Indian nations, comparable to states within

the United States; each holding their individual laws, rules, codes, and sovereignty and yet in totality

a part of the country. Many of the communities, tribal towns and nations continue to maintain

themselves culturally and/or governmentally and remain an integral part of the now federally

recognized Muscogee Nation; e.g. Kialegee Etvlwv, Yuchi - of the Muscogee (Creek) Nation,

Natchez Nation - of the Cherokee and Creek Nations; a sovereign by virtue of treaties of 1796, 1833

& 1866 (Harjo vs. Andrus case, 74-189 - U.S. District Court, Washington, D.C. and/or Harjo v

Kleppe), Hitchiti, Alabamu-Quassarte, Thlopthlocco and many others.

The children's grandmother, Susan Turner, is a member of the Natchez Tribe and minors

R.L. and S.L are eligible for membership. Minors, R. L and S. L., were first brought to the Tribe's

attention on June 24, 2021, because of information received detailing years of severe chronic

physical, emotional, and verbal abuse, as well as neglect and willful, prolonged failure by the

adoptive mother, Margaret Rose Lanam, to provide adequate housing and protection from violent

members of the Chelsea Home Care staff, as well as various nannies, employees, and acquaintances.

The children were removed from the care and custody of Margaret Lanam on July 19, 2021, by Los

Angeles County Department of Children and Family Services following multiple and continuous

MOTION TO INTERVENE AND MEMORANDUM OF POINTS AND AUTHORITIES REGARDING
NATCHEZ NATION ELIGIBILITY TO INTERVENE AND TRIBAL JURISDICTION IN THE CASE OF THE
MINORSDATE: AUGUST 10, 2021TIME: 8:30 A.M.DEPT: 421

reports of said allegations. The Tribe filed a Motion to Intervene, in the Natchez Tribal Courts, on July 14, 2021, and sent a copy to the Los Angeles Courthouse.

Muscogee (Creek) Nation Juvenile and Family Codes, Procedure and Protocol: The intention of this ordinance and its subsections is to set a framework for and appropriate intervention in matters concerning children and families of the Muscogee (Creek) Nation. Any cultural or tribal common-law remedy not specifically referred to herein is to be given full consideration and weight in the proceedings of the Court of the Muscogee (Creek) Nation (e.g. if the tribe already operates a traditional court, and has for eons, its orders are appropriate within the framework of the Muscogee (Creek) Nation).

## POINTS AND AUTHORITIES

The Indian Child Welfare Act classifies an Indian child as a child who is a member of an Indian tribe, or a child who is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe. 25 U.S.C. 1903(4). A tribe's determination that a child is a member of, or is eligible for membership in, a tribe is conclusive evidence that a child is an Indian child within the meaning of the ICWA. *See also*, Indian Child Custody Proceedings, 44 Fed. Reg. 67,584 (Bureau of Indian Affairs Nov. 26, 1979) (guidelines for state courts). Neither enrollment nor blood quantum is required as long as the child is recognized as a member of the tribe or as eligible for membership. *In re Riffle (Riffle II)*, 922 P.2d 510, 513 (Mont. 1996).

Riverside County Department of Children and Family Services failed to provide the Pacific Region of the Bureau of Indian Affairs with the information about the Tribes they received from the parents; allowing the children to be adopted instead of being placed with the extended biological

family, as is required by law. (SEE ATTACHED LA TIMES ARTICLES ON RIVERSIDE COUNTY DCFS). Furthermore, Riverside DCFS did not notify either of the parents, nor any of the extended relatives, and Tribes, that the children were being considered for adoption.

The Indian Child Welfare Act (ICWA) § 1911(c) expressly grants an Indian custodian and an Indian child's tribe the legal right to intervene in a foster care placement or a termination of parental rights proceeding. This right is mandatory and can be exercised at any point in such proceeding. See In re Baby Girl A., 282 Cal. Rprt. 105 (Ct. App. 1991) (certified for partial publication). Tribal participation also ensures that state courts not only protect the best interest of the child as defined by ICWA but also protect the continued existence and integrity of Indian tribes. Any tribe that can demonstrate a connection with the Indian child may be allowed to intervene under state intervention procedures. See Indian Child Custody Proceedings, 44 Fed. Reg. 67,584, 67,587 (Bureau of Indian Affairs Nov. 26, 1979) (guidelines for state courts)

Tribal enrollment, however, is not the only means of establishing membership. *In re T.L.G.*, 108 P.3d 156 (Wash. Ct. App. 2005). Some tribes automatically include a person as a member if the person descended from a tribal member who was listed on the tribal rolls as of a specific date. *In re Arianna R.G.*, 2003 WI 11, 259 Wis. 2d 563, 657 N.W.2d 363. Thus, in some instances, courts have remanded for proper notice even where the parent offered no proof of membership and was not enrolled in a tribe. *In re Gerardo A.*, 14 Cal. Rptr. 3d 798 (Ct. App. 2004); *Dwayne P. v. Superior Court*, 126 Cal. Rptr. 2d 639 (Ct. App. 2002).

The California legislature has repeatedly declared "there is no resource more vital to the continued existence and integrity of Indian tribes than their children, and the United States has a direct interest in protecting Indian children who are members of or are eligible for membership in

- 10 -

MOTION TO INTERVENE AND MEMORANDUM OF POINTS AND AUTHORITIES REGARDING NATCHEZ NATION ELIGIBILITY TO INTERVENE AND TRIBAL JURISDICTION IN THE CASE OF THE MINORSDATE: AUGUST 10, 2021TIME: 8:30 A.M.DEPT: 421

and Indian Tribe, in accordance with the Indian Child Welfare Act. 25 U.S.C. §1901(3).  The failure to fulfill this mandate is not simply a failure of statutory compliance, it is a systemic and ongoing civil rights violation. At a minimum, at the commencement of the action the parents and Indian custodian, if any, of an Indian child, and the Indian child's tribe must be given notice. 25 U.S.C. 1912(a). Notice must be given to each tribe in which the child is a member or is eligible for membership.25 U.S.C. 1912(a); *In re Desiree F.*, 99 Cal. Rptr. 2d 688 (Ct. App. 2000). However, between 2012 and 2014 the Riverside Dependency Court had ample time to inquire, investigate and notify the Muscogee (Creek) Nation prior to adoption and yet, did not. Indian tribes have an interest in the child, which is distinct from, but on a parity with the interest of the parents. *Miss. Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 52 (1989) (quoting from *In re Halloway*, 732 P.2d 962, 969-70 (Utah 1986)). Notice may also be required to any interested party who has a protectable interest under the act, such as an extended family member. *In re M.E.M.*, 635 P.2d 1313 (Mont. 1981).

Notice enables a tribe or the BIA to investigate and determine whether the minor(s) is an Indian child. Notice also ensures that the tribe will be afforded the opportunity to assert its rights under the Act irrespective of the position of the parents, Indian custodian, or state agencies. Specifically, a tribe has the right to intervene in a state court proceeding pursuant to 1911(c) and may have the right to obtain jurisdiction over the proceeding by transfer to its tribal court pursuant to 1911(b). *In re Kahlen W.*, 285 Cal. Rptr. 507 (Ct. App. 1991) (certified for partial publication). Without notice, these important rights granted by the Act would be meaningless. *Id.*; *Cherokee Nation v. Nomura*, 2007 OK 40, 160 P.3d 967. Notice to the tribe also gives the tribe the opportunity

1    to ensure compliance with the placement preferences of section 1915. *Cf. In re Baby Boy C.*, 805

2    N.Y.S.2d 313 (App. Div. 2005).

3           The burden of providing notice is solely on the party seeking the foster care placement of (i.e.

4    the Court, DCFS social workers and attorney's), or termination of parental rights to, an Indian

5    child . . . 25 U.S.C. 1912(a); *In re E.S.*, 964 P.2d 404, 409 (Wash. Ct. App. 1998). This is often a

6    state agency such as a department of social services. *In re Desiree F.*, 99 Cal. Rptr. 2d 688 (Ct. App.

7    2000). Some courts have found that the duty also extends to the courts. *In re J.T.*, 693 A.2d 283, 288

8    (Vt. 1997); *In re H.A.M.*, 961 P.2d 716 (Kan. Ct. App. 1998) (holding trial court required to

9    notify); *In re Levi U.*, 92 Cal. Rptr. 2d 648 (Ct. App. 2000).

10          Some courts hold that failure to give proper notice renders the proceedings null and void. *In

11   re H.D.*, 729 P.2d 1234, 1241 (Kan. Ct. App. 1986); *In re H.A.M.*, 961 P.2d 716, 720 (Kan. Ct. App.

12   1998); *In re Desiree F.*, 99 Cal. Rptr. 2d 688 (Ct. App. 2000). Some appellate courts have remanded

13   to correct the deficiency, leaving it to the lower court to determine whether the error so prejudiced

14   the proceeding as to require its invalidation. *See, e.g.*, *In re M.S.S.*, 936 P.2d 36 (Wash. Ct. App.

15   1997) (holding proper notice not given to the BIA or the tribe so remanded with instructions that only

16   if the lack of notice prejudiced the proceedings was the termination proceeding invalid). *See also In

17   re I.E.M.*, 592 N.W.2d 751, 757-58 (Mich. Ct. App. 1999). Notice to one tribe does not protect the

18   interests of a tribe not given notice, so all tribes in which the minor may be eligible for enrollment

19   must be notified. *In re Desiree F.*, 99 Cal. Rptr. 2d 688 (Ct. App. 2000). If DCFS believed the

20   children were members of another Tribe, they have failed to demonstrate that fact. One of the major

21   Tribes, Cheyenne, has no record of receiving notice, per the attached Exhibit 8- Letter from the

22

23

24

25

26

27                                                  - 12

28   MOTION TO INTERVENE AND MEMORANDUM OF POINTS AND AUTHORITIES REGARDING
     NATCHEZ NATION ELIGIBILITY TO INTERVENE AND TRIBAL JURISDICTION IN THE CASE OF THE
     MINORSDATE: AUGUST 10, 2021TIME: 8:30 A.M.DEPT: 421

1   Cheyenne Tribe. Other federally recognized Tribes have disclosed that they too were never notified

2   about any court proceedings on the eligible Indian minors between 2012 and 2014.

3        The Indian Child Welfare Act (ICWA) requires a state or private placement agency to place a

4   child in a home that reflects the prevailing social and cultural standards of the tribal community. 25

5   U.S.C. § 1915(d). Although the ICWA sets out placement priorities for Indian children placed by

6   state or county child welfare agencies, the law permits the tribe to alter those preferences by

7

8   resolution and the state or county must abide by the resolution unless it does not represent the least

9   restrictive alternative for the child. 25 U.S.C. § 1915(c).

10        The United States, every State, every territory or possession of the United States, and every

11  Indian tribe shall give full faith and credit to the public acts, records, and judicial proceedings of any

12  Indian tribe applicable to Indian child custody proceedings to the same extent that such entities give

13  full faith and credit to the public acts, records, and judicial proceedings of any other entity. 25 U.S.C

14

15  § 1911.

16        Tribes may intervene in a state court voluntary or involuntary foster care placement or

17  termination of parental rights proceeding. 25 U.S.C. 1911(c). ICWA explicitly requires the courts to

18  provide notice to the tribe of an involuntary foster care placement or termination of parental rights

19  proceeding and due process may require notice in voluntary proceedings. 25 U.S.C. 1912(a).

20  Adequate notice has always been required in voluntary and involuntary proceedings either by judicial

21  decision, statute, state regulation, court rule or tribal/state agreement. Further, if the tribe is a party to

22  the proceedings, the tribe has the right to examine all documents filed with the court which may

23

24  affect involuntary foster care placement or termination of parental rights. 25 U.S.C. 1912(c).

25

26

27                                          - 13

1    In any adoptive placement of an Indian child under State law, a preference shall be given, in

2    the absence of good cause to the contrary, to a placement with (1) a member of the child's extended

3    family; (2) other members of the Indian child's tribe; or (3) other Indian families. 25 U.S.C. § 1915.

4    Where an Indian child is not a reservation resident, the child's natural parents have the right to

5    petition a state court to transfer jurisdiction of a voluntary or involuntary foster care placement or

6    termination of parental rights proceeding to the tribe's court. 25 U.S.C. 1911(b).  Courts must

7    provide natural parents with notice of any involuntary foster care placement or termination of

8    parental rights proceeding as well as appoint counsel for indigent natural parents in such cases. 25

9    U.S.C. 1912(a)-(b). ICWA provides natural parents with the right to examine all documents filed

10   with the court which may influence any decision regarding involuntary foster care placement or

11   termination of parental rights. 25 U.S.C. 1912(c).

12          ICWA requires that any party seeking an involuntary foster care placement or

13   termination of parental rights must satisfy the court that it has engaged in active efforts to provide the

14   child's natural parents with remedial services and rehabilitative programs that are designed to prevent

15   the breakup of the Indian family and must also prove to the court that these efforts were

16   unsuccessful. 25 U.S.C. 1912(e)-(f). The same applies to other members of the family. Extended

17   family of [eligible] Indian children have the right to a first preference as a placement for that child in

18   a foster or adoptive home, absent good cause to the contrary. 25 U.S.C. 1915(a)-(b). Unless the tribe

19   otherwise defines the term extended family member, this includes the Indian as well as non-Indian

20   extended family of Indian children with the understanding that this preference seeks to protect the

21   rights of the Indian child as an Indian and the rights of the Indian community and tribe in retaining its

22   children in its society. 25 U.S.C. 1903(2); H.R. REP. NO. 95-1386, at 23 (1978).

- 14

MOTION TO INTERVENE AND MEMORANDUM OF POINTS AND AUTHORITIES REGARDING
NATCHEZ NATION ELIGIBILITY TO INTERVENE AND TRIBAL JURISDICTION IN THE CASE OF THE
MINORSDATE: AUGUST 10, 2021TIME: 8:30 A.M.DEPT: 421

Extended family members qualify for the foster care or adoptive placement of an Indian child based on the social and cultural standards for qualification of the Indian community in which the parent or extended family resides or with which the parent or extended family members maintain social and cultural ties. 25 U.S.C. 1915(d). ICWA allows extended family members to intervene in a foster care placement or adoption proceeding to protect their right to preferential consideration in the placement of an Indian child. *E.A. v. State*, 46 P.3d 986 (Alaska 2002). If an Indian child is not to be placed with an extended family member or a tribal member, an Indian family who is not extended family or comprised of members of the child's tribe has the right to a preference as a placement for an Indian child in an adoptive home, absent good cause to the contrary. 25 U.S.C. 1915(a). Similarly, if the child is not to be placed with an extended family member or in a foster home licensed or approved by the child's tribe, an unrelated Indian family has the right to a preference, as a placement for an Indian child in a foster home if the family is licensed or approved by an authorized non-Indian licensing authority. 25 U.S.C. 1915(b)(iii).

ICWA provides that Indian families qualify for the foster care or adoptive placement of an Indian child based on the social and cultural standards for qualification of the Indian community in which the parent or extended family resides or with which the parent or extended family members maintain social and cultural ties. 25 U.S.C. 1915(d). Non-Indian adoptive parents have less rights than natural parents should their adoptive children ever be removed from their home or placed for adoption since such parents are not included within the definition of parent under the Act. The rights of adoptive parents extend to individuals who have adopted an Indian child **pursuant to tribal law or custom as well as under state law.** ICWA requires every state and every other Indian tribe to give full faith and credit to the tribe's laws and court orders applicable to foster care, termination of

- 15 -
MOTION TO INTERVENE AND MEMORANDUM OF POINTS AND AUTHORITIES REGARDING NATCHEZ NATION ELIGIBILITY TO INTERVENE AND TRIBAL JURISDICTION IN THE CASE OF THE MINORSDATE: AUGUST 10, 2021TIME: 8:30 A.M.DEPT: 421

1   parental rights and adoption proceedings. 25 U.S.C. 1911(d). However, there is no law under ICWA

2   which allows the Court, DCFS, or any other party associated with the case to place eligible Tribal

3   children (particularly those that have been removed on an emergency basis) in a home that the Tribe

4   did not recommend, approve, or accept; nor with persons that the Tribe has not been allowed to

5   thoroughly investigate or clear. Willful placement by DCFS, the Court or any other personnel

6   associated with this case is a blatant disregard of the Five Civilized Tribes, the sovereign Muscogee

7   (Creek) Nation, U.S. and Indian treaties, the U.S. Constitution, the laws of all states, all federal

8   ICWA laws and the laws of the State California.

9

10      Federal law specifically recognizes tribal jurisdiction in ICWA matters. ICWA was intended

11  to supplement and complement the powers and jurisdiction of Indian Tribes, not diminish them.

12  Mississippi Band of Choctaw Indians v. Holyfield, 490 U.S. 30 (1989); see also Native Village of

13  Venetie v. Alaska, 944 F.2d 548, 562 (9th Cir. 1991). ICWA serves to rectify state agency and court

14  actions that result in the removal of eligible Indian children. Doe v. Mann, 415 F.3d 1038, 1047 (9th

15  Cir. 2005). "'At the heart of ICWA' lies a jurisdictional scheme aimed at ensuring that tribes have a

16  role in adjudicating and participating in child custody proceedings involving Indian children

17  domiciled both on and off the reservation." Id. at 1049. Under §1911(b), there is, "concurrent but

18  presumptively tribal jurisdiction in the case of [ eligible Indian] children not domiciled on the

19  reservation." Id. at 36. However, nothing in P.L. 280 strips tribes of the right, concurrent with states,

20  to exercise the jurisdiction recognized in ICWA.4 See Id. at 745-46 (recognizing Venetie's holding

21  that "[Public Law] 280 had not stripped [the tribe] of sovereignty over child custody issues because it

22  had granted the states only concurrent jurisdiction"). ICWA provides a process by which tribes

23  affected by P.L. 280 may reassume exclusive jurisdiction over certain child custody matters – a

- 16

MOTION TO INTERVENE AND MEMORANDUM OF POINTS AND AUTHORITIES REGARDING
NATCHEZ NATION ELIGIBILITY TO INTERVENE AND TRIBAL JURISDICTION IN THE CASE OF THE
MINORSDATE: AUGUST 10, 2021TIME: 8:30 A.M.DEPT: 421

process the Natchez Tribe is following. See 61 Fed. Reg. 1,779-01 (Jan. 23, 1996). Further, R.L. and

S.L. are eligible Indian children within the definition of ICWA. 25 U.S.C. §1903(4). Both minors are

the grandchildren of a Muscogee (Natchez) tribal member. ICWA's focus is on the child's tribal

membership as the determining factor in recognizing tribal jurisdiction. Tribal, "jurisdiction hinges

upon the ethnic identity and tribal membership of the child, rather than the geographical location of

the child's domicile. This reflects Congress' recognition of the fact that tribal ties extend beyond the

boundaries of the reservation." Felix Cohen, HANDBOOK OF FEDERAL INDIAN LAW

§7.02[1][c], pp. 1602-03 (2005 ed.). "A Tribe's authority over its reservation or Indian country is

incidental to its authority over its members." Venetie, 944 F.2d at 559, n.12 (citations omitted). A

tribe's determination of membership or eligibility is conclusive evidence that a child is an Indian

Child within the meaning of ICWA. 44 Fed. Reg. 67,584 (Nov. 26, 1979); see also In Re Junious M.,

193 Cal. Rptr. 40 (Cal. App. Dist. 1, 1983). Questioning Tribal standing is on par with disregarding

ICWA and other federal laws recognizing Tribal authority and sovereignty with regards to its

members and their descendants.  In the United States v. Quiver, 241 U.S. 602, 603-4 (1916) (It is the

settled policy of Congress, "to permit the personal and domestic relations of the Indians with each

other to be regulated . . . according to their tribal customs and laws."). Tribal ability to determine

questions of internal relations derives from their status as a distinct political entity. See, e.g., Fisher

v. District Court of Sixteenth Judicial Dist. of Mont., 424 U.S. 382, 390 (1976) (per curiam)

(recognizing that the jurisdiction of a tribal court derives not from the status of the plaintiff, but

"from the quasi-sovereign status of the [Tribe] under federal law.").  As shown, regardless of their

residence at the time the Tribe first exerted its jurisdiction over their custody, the Tribe's inherent

right to exert jurisdiction over the minor Indian children is recognized by federal law. The failure of

MOTION TO INTERVENE AND MEMORANDUM OF POINTS AND AUTHORITIES REGARDING
NATCHEZ NATION ELIGIBILITY TO INTERVENE AND TRIBAL JURISDICTION IN THE CASE OF THE
MINORSDATE: AUGUST 10, 2021TIME: 8:30 A.M.DEPT: 421

Riverside County DCFS to provide proper Notice denied the Tribe due process, "a violation of I.C.R.A. (1968) – Title 25 U.S.C. §§1302(2)(6)(8) and 1303." See Complaint p. 3, lines 25- 26; p. 5, lines 25-26. The ICRA is not included by the Petitioner as a basis of the Court's jurisdiction. See Id. p. 2, lines 8-14. to state a claim for violation of due process under §1302 for the Tribal ICWA also recognizes exclusive tribal jurisdiction over Indian children who are wards of the Tribal Court, regardless of the child's domicile or residence. 25 U.S.C. §1911(a). The Tribe's exercise of its rights to adjudicate Indian child custody proceedings is not and should not be seen as criminal or punitive.

The Tribe is not constrained by the United States or California's Constitution. The Constitution's Restrictions Do Not Apply to Indian Tribes. In Talton v. Mayes, 163 U.S. 376 (1896), the U.S. Supreme Court addressed the issue of whether the U.S. Constitution, and the restrictions on government action therein, was applicable to the actions of Indian tribes. The Court held the Constitution only restricts the federal and state governments, not tribal governments. Talton, 163 U.S. at 382-5. After Talton, the Court again addressed the issue of the Constitution's application to tribal governments, and held that, "[a]s separate sovereigns pre-existing the Constitution, tribes have historically been regarded as unconstrained by those constitutional provisions framed specifically as limitations on federal or state authority." Santa Clara Pueblo, 436 U.S. at 56. The Ninth Circuit subsequently held, "Constitutional guarantees . . . are not applicable to the exercise of governmental powers by an Indian Tribe except to the extent that they are made explicitly binding by the Constitution or are imposed by Congress." Trans-Canada Enter., Ltd. v. Muckleshoot Indian Tribe, 634 F.2d 474, 476-7 (9th Cir. 1980). Similarly, tribe's sovereign status generally prevents state laws from being applied to the tribe. See generally Worchester v. Georgia, 31 U.S. 515, 561 (1832) (holding that state law "can have no force" in Indian Country). It remains the general rule that states

- 18

MOTION TO INTERVENE AND MEMORANDUM OF POINTS AND AUTHORITIES REGARDING NATCHEZ NATION ELIGIBILITY TO INTERVENE AND TRIBAL JURISDICTION IN THE CASE OF THE MINORSDATE: AUGUST 10, 2021TIME: 8:30 A.M.DEPT: 421

may not regulate tribes without express Congressional consent. See Oklahoma Tax Comm'n v. Chickasaw Nation, 515 U.S. 450 (1995); Bryan v. Itasca County, 426 U.S. 373 (1976). The Tribe is therefore not subject to the constraints on governmental action contained in either the U.S. or California Constitutions. The Supreme Court has repeatedly recognized tribal courts, "as appropriate forums for the exclusive adjudication of disputes affecting important personal and property interests of both Indians and non-Indians."

## CONCLUSION

The Court should make the following findings: (1) That the court has jurisdiction to determine its jurisdiction. (2) The court lacks jurisdiction to place the minor children without giving adequate and proper notice to the Indian Tribe. (3) The Court and the parties involved have an affirmative and continuing duty to give adequate notice to all participants and persons identified in CRC Rule 5.480, et seq. (4) The Court should further find that the children are eligible for membership in the tribe and therefore covered by ICWA. (5) Riverside Juvenile Court and Riverside County DCFS lacked jurisdiction for foster care placement, adoptive placement without notifying and adhering to the Tribe and ICWA law regarding placement. This case must be dismissed immediately and transferred to the Tribal Courts for determination. Based on the failures of DCFS and the Courts to protect the rights of the children under ICWA, all orders hereto fore maid are null and void initio. No participant in the current or former case gave notice to the Tribe as to the status of the children as Native American.

The court should dismiss this proceeding so that the Native Tribe can assume jurisdiction and custody of the children. All rights of the adoptive mother, Margaret Rose Lanam, should be

MOTION TO INTERVENE AND MEMORANDUM OF POINTS AND AUTHORITIES REGARDING NATCHEZ NATION ELIGIBILITY TO INTERVENE AND TRIBAL JURISDICTION IN THE CASE OF THE MINORSDATE: AUGUST 10, 2021TIME: 8:30 A.M.DEPT: 421

1  forfeited immediately, and temporary custody of the children should be placed with the extended

2  family members, Susan Elizabeth Turner, the Tribal appointed Indian Custodian, other biological

3  grandparents and extended family, or Elizabeth Ebow, the paternal aunt whom the children have

4  resided, vacationed, and travelled with for extensive periods of time since 2017. The Court has the

5  power to invalidate the adoption of the two minor children based on its failures to comply with

6  ICWA, lack of jurisdiction and the superior jurisdiction of the Tribe. The Tribe has the primary right

7  to conduct a hearing-based on allegations of physical, emotional and verbal abuse of the minors at

8  the hands of the adoptive mother. Representatives of the Tribe must be given access to the minor

9  children, to investigate matters further. Riverside County has a history of failing to adequately

10  investigate abuse allegations. (See attached Exhibit 9- "Newspaper articles on Riverside DCFS")

11

12

13  Dated this 6th day of August 2021

14

15  Thomasina Reed, ESQ

16  Attorney for Muscogee (Natchez) Nation

17

18

19

20

21

22

23

24

25

26

27  - 20

28  MOTION TO INTERVENE AND MEMORANDUM OF POINTS AND AUTHORITIES REGARDING
NATCHEZ NATION ELIGIBILITY TO INTERVENE AND TRIBAL JURISDICTION IN THE CASE OF THE
MINORSDATE: AUGUST 10, 2021TIME: 8:30 A.M.DEPT: 421

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT "1"

- 21
MOTION TO INTERVENE AND MEMORANDUM OF POINTS AND AUTHORITIES REGARDING
NATCHEZ NATION ELIGIBILITY TO INTERVENE AND TRIBAL JURISDICTION IN THE CASE OF THE
MINORSDATE: AUGUST 10, 2021TIME: 8:30 A.M.DEPT: 421

Exhibit 1

# Denise A. Albury, M. D.

644 East Regent Street, Suite 104 Inglewood, CA 90301
(310) 419-2223 (Office)   (310) 419-2226 (fax)

Iyanna Ebow dob 09/09/11 was seen and cared by me from birth to 3 mo old. The baby's last visit here was on 12/13/11. At that time baby weight was 13 pounds 5 oz (75%), height 23 " (25-50%), and head circumference 42 cm (95%). She was developing normally and eating more than she needed to be eating but seem to be cared for appropriately. The baby was given first set of shots. There was no evidence of abuse appreciated during the period I treated her. Please feel free to contact me if you have any other questions.

Sincerely,

Denise A. Albury, MD

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT "2"

- 22
MOTION TO INTERVENE AND MEMORANDUM OF POINTS AND AUTHORITIES REGARDING
NATCHEZ NATION ELIGIBILITY TO INTERVENE AND TRIBAL JURISDICTION IN THE CASE OF THE
MINORSDATE: AUGUST 10, 2021TIME: 8:30 A.M.DEPT: 421

EXHIBIT 2A

ANDREA M. TYTELL

**THE LAW OFFICES OF**
**ANDREA M. TYTELL**
2121 ROSECRANS AVENUE • SUITE 1350
EL SEGUNDO, CALIFORNIA 90245

TELEPHONE: (310) 416-9710
FACSIMILE: (310) 640-1601

December 5, 2013

**Sent Via Facsimile 951-358-7706 & U.S. Mail**
Letesha Brager, Esq.
9991 County Farm Road
Riverside, California 92503

**Sent Via Facsimile 951-689-1267 &. U.S. Mail**
Bruce C. Williams, Esq.
9991 County Farm Road
Riverside, California 92503

**Sent Via Facsimile 951-689-1267 & U.S. Mail**
Carol Perez, Esq.
9991 County Farm Road
Riverside, California 92503

Re: Nasiya S. Ebow AKA Sasha S. Ebow (dob 10/10/12)
Iyanna Ebow (dob 9/9/11)
Case Number: RIJ 200191

Dear Counsel:

My office has been retained by Caroline Yetman who is the biological aunt of the minors referenced above. Since being retained, my office has conducted extensive research about the Indian ancestry of the minor children. Ms. Yetman, as a first live blood relative is well qualified to care for the minor children and demand that she be live scanned immediately. I am enclosing herewith the proof of the following ancestry:

**On Biological Father's side:** All of the below are registered members of the Chickasaw Tribe:
Lizzie Alexander - Ian Ebow's great great grandmother
Lawrence Ebow - Ian Ebow's great grandfather
Robert Ebow- Ian Ebow's grandfather

**On Biological Mother's side:** All fo the below are registered members of the Choctaw Tribe:
Frank Turner - Amanda Turner's great grandfather
Frank Turner - Amanda Turner's grandfather

EXHIBIT 2A

Letesha Brager, Esq.
Bruce Williams, Esq.
Carol Perez, Esq.
December 5, 2013
Page 2

There is also ancestry with the Cherokee Nation, the Morogon and Cheyenne Tribes. I will be providing proof of this as soon as I have tangible evidence of same.

In the interim, this matter must be continued until all relevant parties are located and can state their positions before the Court.

If you have any questions, kindly address them to the undersigned.

                              Very truly yours,
                              Law Office of Andrea M. Tytell

AMT:sf                        Andrea M. Tytell
cc: client

EXHIBIT 2B

Carolyn Yetnan
5922 Barton Avenue
Los Angeles CA 90038
2/01/2014

To: Lisa Raigspraw/DPSS

This letter is sent to inform you of the unfair treatment and the abuse of
power mete out to me by Le Tisha Bragger and her supervisor Ben Brandon;
in regards to the placement of my nieces, Iyanna Elizabeth Ebow and
Na'Siya Sereen Ebow, in my home at: 5922 Barton Avenue, Los Angeles,
California 90038. Ms. Raigspraw, as you know, I have met the necessary
requirements to be the caregiver of my two nieces: Iyanna & Na'Siya Ebow.
From the very beginning I have encountered resistance from Le Tisha
Bragger behind the placement of my two nieces. I have complained to you
and Ben Brandon that Le Tisha Bragger refused to return my phone calls
regarding my application for placement of the children. I also made you
aware that Ms. Bragger would contact me, only after I'd contacted you, Ms.
Raigspraw. I continued to relentlessly try and contact Ms. Bragger to no
avail. Finally, after numerous phone calls, Ms. Bragger gave me the name of
the home inspector, which I contacted immediately. This occurred in May of
2013. Upon receiving the necessary documents from the home inspector, I
immediately went to get fingerprinted and filled out the forms for a
background check.  However, the inspector waited a long time (months)
before informing me of the results. Finally after many phone calls were
placed to Ms. Raigspraw, an individual by the name of Jody Ann contacted
me, to inform me that Le Tisha Bragger told her not to inspect the home
because the children "have been permanently placed". Also, that any
inspection of my home, made on my behalf, would be considered "null and
void". I told Jody Ann that Le Tisha Bragger has been attacking the family
since the beginning of the case. And in spite of Ms. Bragger's demands, I
still needed to have my home inspected. The first appointment was set at a
time immediately following the death of my grandmother and I'd also
recently started my new job, both of which resulted in the cancellation of the
appointment. I then set a second date for inspection. However, a few days
before the inspection, my employer denied me the day off because I'd
already missed many days due to my grandmother's death. For fear of losing
my job, I canceled the second appointment. I contacted JodyAnn and
explained all that had happened and she told me that it was not a problem.

Exhibit 2B

She stated that I could always reschedule an inspection for a later date, because inspection of my home did not mean the children would be placed with me. Since Ms. Bragger indicated that the children were already permanently placed. Jody Ann then informed me that I should call her when I was available. I called in December to schedule a date and Jody Ann told me that she was for inspection on the 22nd and 23rd of December 2013. I told her that I must first confirm which date I could take off from work with my boss. My boss told me that the 22rd of December was ok to take off, so I called JodyAnn immediately to schedule the appointment for the inspection. Ms. Jody Ann refused to answer my calls, so I left several messages on her phone about the date for inspection. Jody Ann did not call me to confirm that she would be there on the 22nd of December, however, I waited for her to show up and she did not. I called her phone many times to let her know that I was waiting for her to inspect the home, but she refused to answer me. I then, contacted her boss, Lisa Raigspraw, to help me contact Jody Ann. Ms. Raigspraw contacted her on the 22nd of December where she then told Ms. Raigspraw that she'd already closed the case. I told Ms. Raigspraw that Jody Ann gave me those dates as times she would be available for an inspection; so Ms. Raigspraw told Jody Ann to call me to resolve that issue. Jody Ann called me and told me that I need to call Ms. Bragger to get another appointment. I called Ms. Bragger, but she did not return any of my phone calls. Then I called Ms. Bragger supervisor, Ben Brandon, and I discussed the matter with him. Ben Brandon told me, I only had two chances to get my house inspected and I did not. Also, that I am irresponsible and that there will be no more scheduled inspections for my home. He made it quite clear that I did not stand a chance of getting my home inspected. I told Mr. Brandon that at no point in time had anyone ever explained to me that I only have two chances to get the home inspected. I was given two days in December as potential dates for inspection, however, when I called to confirm one of the dates; I was suddenly informed that the case was closed. All of this occurred without prior notification to me. I am in awe at that fact that *Margaret Lanam had three home inspection cancellations with the same home inspection unit prior to the children being placed in her home; and they did not close her file, but they closed mine.* I was also insulted by Mr. Brandon's reference to me as "an irresponsible person", when I have an obligation to fulfill my job. My boss told me that I could not take the day off. I'd be irresponsible by defying my boss and losing my sole source of income. Mr. Brandon told me to call him back in January of 2014. I told him that I am the overseer of my grand mother's estate and I have to leave to take care of it. He asked me how long I would be gone and I told him that I

Exhibit 2B

would be back on January 20, 2014. He then told me to call him when I returned. I called him immediately after returning and a few days later he called me back to inform me that I was not going to get another inspection because the children were already placed. It is quite clear that Riverside Social Services did not have any intention of placing my nieces with me, seeing as how they have grossly abused their power and violated the father and my family's rights. The Riverside Home inspection unit refused to inspect the property and failed to provide valid reasoning for as much. The home inspection unit gave me a date for inspection and then quickly closed the file without notifying me. I would like for this matter to be investigated immediately.

Carolyn Yetman

Exhibit 2D

☰        *Los Angeles Times*        LOG IN   🔍

ADVERTISEMENT

CALIFORNIA

# Social workers failed to protect Noah McIntosh before his death, lawsuit alleges



Noah McIntosh, 8, in a photo released by Corona police, left, and in a family photo. (KTLA-TV; family photo)

BY HANNAH FRY | STAFF WRITER

JULY 17, 2020 2:36 PM PT

A civil lawsuit filed against Riverside County last month alleges that social workers were aware of allegations of abuse being inflicted on 8-year-old Noah McIntosh nearly two years before the boy's death but failed to properly investigate and intervene to protect him.

The boy's father, Bryce McIntosh, is awaiting trial on torture and murder charges in connection with his son's death last year. Noah's mother, Jillian Godfrey, pleaded guilty to two felony counts of child endangerment in December.

Noah was reported missing by his mother in March 2019 after years of "horrific abuse and neglect" at the hands of his father that on at least three occasions triggered referrals by Riverside County Child Protective Services, according to the lawsuit. Despite an intense search that produced many incriminating clues, Noah's body has not been found.

The lawsuit, filed in Riverside County Superior Court on behalf of Noah's older sister, who is a minor, names the county and five social workers who attorneys contend violated the state's Child Abuse and Neglect Reporting Act and breached their duties when they failed to protect the girl and her brother.

ADVERTISEMENT

Case 2:22-cv-00396-UA   Document 1-1   Filed 01/18/22   Page 47 of 69   Page ID #:50
9/6/2021   EXHIBIT 2D
Suit accuses social workers of failing to protect Corona boy - Los Angeles Times

"There's cases where social workers have to make tough calls, but this case in particular was one where it was clear that this boy and his sister were being abused and the father really didn't deny it," said attorney Roger Booth, who is representing the girl. "They really had an opportunity to do something here and they just did nothing."

County spokeswoman Brooke Federico noted that the county has made several improvements since late 2019 to the county's Children's Services Division, including leadership changes and a "shift in culture towards greater accountability and safer practices and outcomes."

"While the county is limited on providing specific details related to any pending litigation, protecting children, dependent adults and families from abuse and neglect is at the core of the Department of Public Social Services' mission and is a top priority for the county," Federico wrote in an email. "It's heartbreaking when children and vulnerable adults suffer harm."

News of the lawsuit comes a day after a Los Angeles County Superior Court judge dismissed criminal charges of child abuse and falsifying public records against four social workers who had been accused of failing to protect Gabriel Fernandez. The 8-year-old Palmdale boy was tortured and killed by his mother and her boyfriend in 2013.

Gabriel's case, which became the subject of a Netflix series, touched off a firestorm of debate over the breakdown of local government in protecting him and whether social workers should be held criminally liable in such situations.

"There's certain cases — the Fernandez case is an example and the McIntosh case is an example — where it's clear that CPS should act," Booth said. "They're not just there to do investigations and write reports. They are there to take action when action is required. That's what these cases are about."

Noah and his sister lived for several years with their maternal grandparents in Orange County until July 2017, when they went to visit their father in Corona and he refused to return them. A month later, social workers were called to investigate allegations of neglect and physical abuse.

According to the complaint, over the course of their investigation, the workers learned that Noah's hands and feet had been zip-tied together for long periods of time, he was handcuffed to a bathtub in cold water for hours, had his head dunked underwater — sometimes while wearing a blindfold — and was forced to consume laxatives and made to sit in his own feces if he soiled himself. Noah's sister was forced to assist their father in carrying out the torture and was subjected to her own physical and psychological abuse, the lawsuit alleges.

ADVERTISEMENT

The social workers acknowledged in writing that the father had "inflicted serious physical harm on Noah" and "was a threat to continue to do so," the lawsuit states. However, when McIntosh and Godfrey refused to cooperate with their investigation, the social workers closed their file without interviewing the children.

In November 2017, social workers received another referral to the home, based on allegations of general neglect. They learned that McIntosh — as a form of punishment — had taken Noah to school wearing only toilet training pants and a shirt. He had also forced the boy to wear girl's clothing to school, according to the lawsuit.

Once again, the lawsuit alleges, the parents would not speak to social workers or allow their children to do so. Social workers closed the investigation as inconclusive and took no further action.

Three months later, social workers received a third allegation of neglect and discovered that McIntosh had forced his children to sleep in a car with their mother. Officials again closed the referral as inconclusive after the parents again refused to cooperate, according to the lawsuit.

ADVERTISEMENT

The lawsuit is seeking an undisclosed amount in damages from the county. It is also seeking punitive damages against the individual social workers, an effort to hold them legally accountable for their actions.

"The parents' lack of cooperation, rather than being a reason to stop defendants' investigations in their tracks, should have made it clear to defendants that more proactive steps were urgently needed," the lawsuit states. "Defendants did not exercise discretion in deciding not to take such steps. Rather, they willfully turned a blind eye to the abuse and neglect and simply decided not to do their jobs."

## The view from Sacramento

For reporting and exclusive analysis from bureau chief John Myers, get our California Politics newsletter.

> Enter email address

> Sign me up

You may occasionally receive promotional content from the Los Angeles Times.

Hannah Fry

🐦 Twitter    📷 Instagram    ✉ Email    f Facebook

Hannah Fry is a Metro reporter covering Orange County for the Los Angeles Times. She joined the newspaper in 2013 as a reporter for the Daily Pilot, a Times Community News publication. Fry most recently covered breaking news for The Times and was part of the team that was a 2020 Pulitzer finalist for its coverage of a boat fire that killed 34 people off the coast of Santa Barbara. She grew up in Orange County and got her start as an intern at the Orange County Register.

EXHIBIT 2D

**NEWS**

# Parents file $10 million claim against Riverside County for death of 'Princess Diane'

17-year-old died in care of controversial Murrieta foster home that county should have known was a "death sentence," claim says



Diane Ramirez. (Courtesy Angel Cadena)

By TERI SFORZA | tsforza@scng.com and DAVID DOWNEY | ddowney@scng.com | Orange County Register
PUBLISHED: October 11, 2019 at 1:53 p.m. | UPDATED: October 12, 2019 at 9:24 a.m.



Exhibit 2D

Her body was confined to a wheelchair, but her mind was sharp and her heart was full. At 17, "Princess Diane" Ramirez had big plans for the future: She wanted to go to college, get a California ID, open a savings account, move out of a foster home for severely disabled kids and live again with her dad, whom she adored.

Diane didn't like to wear socks or shoes. She was a bit "boy crazy," lighting up with peals of delight whenever anyone mentioned Jeff Miller, the star quarterback for Murrieta Mesa High School who took her to the school's "Spectacular Prom." Her dad was putting the finishing touches on Diane's new room when he got the call on April 6:

Diane, who he had just visited the day before, was dead.

An autopsy concluded an obstruction caused by a twisted intestine was to blame, something that might have been corrected had Diane gone to the hospital at the first signs of distress.

An investigation by the state Department of Social Services concluded that the Michelle Morris foster home in Murrieta — controversial across two counties for nearly 20 years — "neglected to obtain emergency medical care for (Diane) in a timely manner." The staff's actions posed "an immediate risk to the children placed in care," it said.

Foster mother Morris, 78, refused to sign the document when social workers presented it to her in September, but in many ways it was moot: She had surrendered her foster license in May, about a month after Diane's death.

Diane's parents, Alberto Ramirez Jr. and Angel Ramirez, filed a $10 million claim against Riverside County on Oct. 3, saying the county knew — or should have known — that placing Diane in Morris' home "was a death sentence waiting to happen."

"There have been so many red flags over the years — so many reports that something there is wrong," said attorney Charles Krolikowski, who represents Diane's parents. "The county sends social workers to go out to 'investigate' complaints for 15 minutes. The social workers can't talk to the kids themselves, because most of the kids are nonverbal. So they talk to the foster parents, who say the reports are wrong and everything is fine. Then they leave."

Calls for comment went unanswered at the Morris home, and messages left on cellphones were not returned.



EXHIBIT 2D

Riverside County officials said they could not discuss details due to impending litigation and client confidentiality. "However, when a critical incident occurs, our hearts are broken," spokeswoman Brooke Federico said. "We strive to understand the circumstances surrounding that injury or death as part of our commitment to continuous improvement and ensuring the highest safeguards for children.

"Since May, the Children's Services Division at the Riverside County Department of Public Social Services put a number of measures into effect. Those measures include expanded safeguards, enhanced training for social workers, extended hours in the Specialized Placement Unit to better accommodate child placements, expanded audits for high-risk cases and stronger contracts with foster family agencies to ensure supervision and compliance with policies and best practices."

## In life, an indomitable spirit

Diane was a holiday baby, born on Dec. 15, 2001. Diagnosed with cerebral palsy, seizure disorder and other challenges, she nonetheless had an indomitable spirit and mischievous sense of humor that people found infectious.

She was in 11th grade, assessed at grade level and flourishing at Murrieta Mesa High School, where her "prom-posal" to quarterback Miller made the TV news, and where she'd place fake spiders in her locker to scare the teachers who helped her open it, according to records and family members.

From her birth until 2018, Diane lived with both her parents and siblings. Then the Ramirezes separated. A difficult divorce ensued. Diane spent the majority of time with her mother, visiting often with her father, until her mother's personal issues made caring for Diane difficult. Her father was not yet in a situation where he could take over, so the county temporarily placed Diane in the Morris home while the parents worked toward reunification.

Complaints about the quality of Diane's care soon followed. Morris "does not take good care of Diane or the children she takes and 'is just doing it for the money,' " one of Diane's teachers told county workers, according to social workers' internal logs.

The state pays about $6,000 per month for the care of one severely disabled child in foster care. Morris was licensed for five, and had adopted several more disabled children for which she also received adoption assistance from the government.



Exhibit 2D

The teacher also complained that the school's concerns were not being taken seriously, including reports of four seizures at school from October 2018 to February 2019. Morris "was questioning whether Diane was having seizures, when the staff has seen Diane having the seizures," the logs said. The teacher said Morris "always minimizes their concerns."

Social workers followed up on a complaint about this to the county child abuse hotline. "The caregiver reported she has doubts whether Diane actually had seizures, as she has not seen them," says a county report. "The caregiver stated that Diane 'gets a lot of attention' when she has a seizure, so the caregiver believes this may be a reason why Diane has reported seizures."

Diane's Tobii communication device was often uncharged for visits with family and social workers as well as during school, effectively silencing her, according to the complaint logs. "The caregiver indicated that Diane gets tired while using the 'Toby' (sic) and that Diane 'doesn't like it.' " After complaints, the device was charged up and often available, records show.

Diane also received a feeding tube directly into her stomach, which Morris said allowed Diane to finally gain weight. There were several reports, however, that the feeding tube would fall out and be shoved back in without proper cleaning or disinfecting, according to the parents' claim.

This feeding tube — and the restrictions on solid food that it entailed — would become a point of contention in Diane's death.

## Spiral into death

Morris "explained that Diane's main problem was eating by mouth," a county report said. "She states the more they got to know her the more they realized she did not like to eat food. However, she was a people pleaser and would do it to please others."

Morris accused school officials of feeding Diane solid food, which Morris said made Diane vomit dark brown, dried blood and required suctioning. Officials insisted they did not feed Diane by mouth.

Diane was visiting regularly with her father, and Morris accused him of feeding her by mouth as well — a charge he also denied.

It was an ongoing struggle for months, Morris told social workers.



EXHIBIT 2D

By February, Diane was missing her family and longed to reunite with them, according to reports. She told them she needed help and asked for therapy. On Feb. 28, social workers requested a new placement for Diane, saying: "The child's current placement has failed to meet the child's needs."

However, Diane wasn't moved.

On April 2, Diane "appeared down and was not smiling as usual," and began to vomit. She went to the hospital, where she was stabilized and released. Morris "was given specific discharge instructions, which indicated that should Diane's condition worsen and include vomiting of blood, Michelle was to call 911 and have Diane transported to the ER immediately," according to the county claim. Morris was instructed to follow up with Diane's doctor in one or two days — or sooner if the girl's condition worsened.

On April 5, Diane had a visit with her father. They went to the mall for a few hours, played video games and popped in and out of stores. Alberto Ramirez said Diane was feeling fine and showed no signs of ill health or discomfort, according to the autopsy.

But that night, at about 11:30 p.m., Morris heard a thud. She went to Diane's room and found Diane "throwing up all over herself" and having difficulty breathing, according to county reports. The vomit was brown, which suggested old blood, Morris told officials with the Department of Social Services.

Staffers used another child's medical equipment to suction Diane and administer oxygen. She was also given Zofran for nausea. Despite the hospital discharge orders, Morris did not call 911 or take Diane to the hospital. She told staffers Diane was sick because her father fed her solid food and would be all right, according to the reports.

The staffer who was up that night with Diane was not so sure. She "felt that Diane was not herself, and expressed concern to (Morris) that they should take her" to the hospital, a county report says. "Diane did not go to sleep and moaned all night."

As the sky lightened with morning, Diane appeared alert, the reports say. She was suctioned again. But the situation soon changed: Diane's pulse disappeared. An ambulance was summoned at 7:53 a.m., some eight hours after she began to vomit.

Diane was in full cardiac arrest when she arrived at the Inland Valley Medical Center, and was declared dead at 8:45 a.m., according to the state and coroner's reports. "The attending nurse expressed concern about Diane's blood sugar; it was so low it was untraceable," the state report said.



EXHIBIT 2D

An assistant coroner said that if Diane was vomiting blood on Friday, the caregiver should have called 911 right away.

"What kind of monsters would allow a young disabled girl to sustain such suffering?" the parents' claim says. "This warrants a criminal investigation."

## Red flags

The Riverside County coroner's autopsy on Diane took months to complete. She died from a "small bowel infarction" due to a "small bowel volvulus," it concluded — essentially, an obstruction caused by a twisted intestine.

A proper diagnosis could have been made, and surgical treatment could have been provided, if the symptoms were observed sooner, Diane's pediatric gastroenterologist at the Rady's Children Hospital in San Diego told the California Department of Social Services.

While the state substantiated the claim that the Morris home neglected to get emergency medical care for Diane in a timely manner, it did not substantiate the claim that this directly lead to Diane's death. "The Department has determined the staff negligence in initiating emergency medical services for (Diane) may or may not have played a factor in the child's demise and is not supported or proven by the evidence gathered," the DSS report said.

The coroner said Diane died of natural causes. Still, the parents contend, the county should have known better.

Complaints and accusations against the home began in Orange County, where Morris, a former social worker herself, entered the foster business in 1994.

Officials from the Orange County Regional Center — the agency that funds services for the disabled with public dollars — voiced serious concern about "the quality of care and health and safety of the consumers residing at the Michelle Morris Home" in the Tustin foothills and charged that Morris suffered from Munchausen by proxy, a behavior disorder in which caretakers exaggerate children's health problems to gain attention and sympathy, subjecting them to unnecessary or inappropriate medical treatment, according to records.

Morris sued, accusing officials of slander, defamation and violations of child-abuse reporting laws. The agency's insurer settled the case for $750,000 with no admission of wrongdoing, rather than face a jury trial where disabled children could take the stand.



EXHIBIT 2D

In 2007, Morris moved to Riverside County to, in her words, escape "persecution." "Only after Diane's death did the county finally act" against her, the parents' claim contends.

Heartbroken by the loss of their daughter, Diane's parents hope this case ensures that no other children are put in harm's way, and that more rigorous checks and balances for foster homes are put in place so other parents don't have to endure their pain.

Newsroom Guidelines
News Tips
Contact Us
Report an Error

[T] The Trust Project

---

Stay up to date on the latest Coronavirus coverage in your area.

## Coronavirus Update

Enter your email to sign up

**SIGN UP**

Tags: courts, Investigative Reporting, SoCal Watchdog, Top Stories OCR, Top Stories PE, top stories sun

## **Teri Sforza** | Reporter

Teri Sforza is one of the lead reporters on the OCR/SCNG probe of fraud, abuse and death in the Southern California addiction treatment industry. Our "Rehab Riviera" coverage won first place for investigative reporting from the California Newspaper Publishers Association, first place for projects reporting from Best of the West and is a finalist for the National Institute for Health Care Management Foundation's print award, competing with the New York Times, the Washington Post and ProPublica. Sforza birthed the Watchdog column for The Orange County Register in 2008, aiming to keep a critical (but good-humored) eye on governments and nonprofits, large and small. It won first place for public service reporting from the California Newspaper Publishers Association in 2010. She also contributed to the OCR's Pulitzer Prize-winning investigation of fertility fraud at UC Irvine, covered what was then the largest



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT "3"

- 23
MOTION TO INTERVENE AND MEMORANDUM OF POINTS AND AUTHORITIES REGARDING
NATCHEZ NATION ELIGIBILITY TO INTERVENE AND TRIBAL JURISDICTION IN THE CASE OF THE
MINORSDATE: AUGUST 10, 2021TIME: 8:30 A.M.DEPT: 421

Exhibit 3

I, SUSAN ELIZABETH WILLIAMS TURNER, DECLARE AND STATE:

1. I am a resident of the state of California. I have personal knowledge of the facts stated herein, except as to matters stated in information and belief and as to such matters I believe them to be true. I make this declaration under penalty of perjury as provided in the Code of Civil Procedure Section 2015.5. If called as a witness, I could and would be competent to testify thereto.

2. I am the maternal grandmother of Rehanna Margaret Lanam and Sasha Rose Lanam.

3. I am a Native American and a member of the Natchez Nation; however, I am also of Creek, Cherokee, Cheyenne, and Chippewa descent through both of my parents, as well as other tribes.

4. I am the Tribe's appointed Indian Custodian, designated to oversee the care, all custody proceedings, and placement of the children.

5. It is and always has been understood that Rehanna Margaret Lanam and Sasha Rose Lanam are eligible members of multiple tribal nations.

6. I have adopted children in Riverside and Los Angeles County since the 1990's, however, I was never notified in 2012 by Riverside County DCFS nor Riverside Juvenile Courthouse, of any court proceedings, including parental termination, placement plans, adoptions, etc.

7. Furthermore, not only did Riverside County adopt out children of Native American descent (without first contacting the Natchez, Creek, Cherokee, Cheyenne, nor Chippewa Nations), the County sent the children to an individual (Margaret Rose Lanam) who is of no relation to either side of the family by blood or marriage.

8. No resource is more vital to the continued existence and integrity of an Indian tribe than its children.

9. I understand that California has an interest in protecting Indian children who are members of or eligible for membership in an Indian tribe.

10. It is in the interest of the Indian children that the children's membership in their tribe and connection to the tribal community be encouraged and protected, even if the Indian children were not originally in the custody of an Indian parent or Indian custodian.

11. I am devastated by the videos, audio recordings, and text messages of the grotesque abuse and neglect my grandchildren have been subjected to all these years. The Courts cannot imagine how traumatizing this entire ordeal has been for the children, the family and me.

EXHIBIT 3

12. I hope the Court prevents Margaret Rose Lanam from having any further contact with the children, she has done extensive damage.

13. It is in the best interest of the children to be placed with the Indian Custodian, because Rehanna and Sasha need nurturing and true tender love and care that can only come from their biological family. I am ready, willing, and able to bring the girls back home, where they belong.

14. By being with their family, Rehanna and Sasha Lanam will be safe, loved, happy, healthy and within an environment that reflects the children's unique tribal culture and promotes tribal ties; as it always should have been.

15. As the appointed Indian Custodian, I respectfully request that jurisdiction and all future proceedings regarding the Rehanna Lanam and Sasha Lanam case be transferred to the Natchez Nation Tribal Court.

Executed this ___23rd___ day of July 2021, Banning, California, under penalty of perjury under the laws of the State of California.

Susan Elizabeth Williams Turner

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT "4"

- 24
MOTION TO INTERVENE AND MEMORANDUM OF POINTS AND AUTHORITIES REGARDING
NATCHEZ NATION ELIGIBILITY TO INTERVENE AND TRIBAL JURISDICTION IN THE CASE OF THE
MINORSDATE: AUGUST 10, 2021TIME: 8:30 A.M.DEPT: 421

Exhibit 4A



**AFFIDAVIT**

I, Wilbur (Chebon) Gouge, do hereby affirm THAT:

The Muscogee (Creek) Nation Placement Preferences Act, NCA 92-125, was signed into law by the Principal Chief Bill Sunday Fife on the first day of September, 1992, specifically identifying the Natchez Nation as a member tribe of the Muscogee (Creek) Nation. Further, that this legislation has not been amended.

The Comprehensive Juvenile and Family Codes of the Muscogee (Creek) Nation, NCA 92-119, were signed into law by Principal Chief Bill Sunday Fife on the seventh day of October, 1992, specifically identifying within the Procedure and Protocol Section, that "Any cultural or tribal common-law remedy not specifically referred to herein is to be given full consideration and weight in the proceedings of the Court of the Muscogee (Creek) Nation. Further, that this legislation has not been amended.

Under definitions in the Comprehensive Juvenile and Family Codes of the Muscogee (Creek) Nation, and "Juvenile Court" means the Juvenile Division of the Muscogee (Creek) Nation Court System, OR the Juvenile Court or C.F.R. Court established for other Indian tribes, or a state Juvenile Court as is appropriate from the context."

Under The Constitution of the Muscogee (Creek) Nation, Article II, Section 5, "This Constitution shall not in any way abolish the rights and privileges of persons of the Muscogee (Creek) Nation to organize tribal towns or recognize its Muscogee (Creek) Traditions." Further that the Muscogee (Creek) Constitution has not been amended and that the Natchez Nation, is historically and by treaty signatures with the United States of America, a member tribe of the Muscogee (Creek) Nation.

_____
Wilbur Gouge, Speaker
Muscogee (Creek) National Council

Subscribed and sworn to before me this 16th day of July, 2001 at Okmulgee, Oklahoma.

_____
Notary Public

_____11-04-02_____
My Commission Expires

EXHIBIT 4B

01/01/2008  01:10   9184895244                     NATCHEZ NATION                     PAGE   03

FILED
IN THE TRADITIONAL COURT
OF THE NATCHEZ NATION

IN THE DISTRICT COURT OF LOS ANGELES COUNTY
STATE OF CALIFORNIA

IN THE MATTER OF                              )        NN Case No.: 2021CP:043
Grandchildren of Susan Elizabeth (Williams) Turner   )   LA Co. Case No.:
Rehanna Lanam DOB 9/9/2011                    )
Sasha Lanam DOB 10/10/2012                    )
NN#: GM=1028                                  )

AFFIDAVIT

This affidavit may be written and executed in a different form and fashion that that used by the court referenced above. It is meant to advise the Court in the above noted cause. The Natchez Court requests that the following be accepted into the record with good faith and credit by the above-named court as a document filed, as well, within the court records of the Natchez Nation.

PERSONALLY APPEARED BEFORE ME this 14th day of July, 2021, Kent T. "Hutke" Fields, who, after being first duly sworn, does hereby affirm:

1)  THAT I am the Principal Chief of the Natchez Nation located in Notchietown north of Gore, Oklahoma. That the Natchez have helped the Cherokee, both Eastern and Western, maintain their traditions and culture for centuries. Further that I am responsible for the administration of Children and Family matters for our nation. Further that the above named children are eligible for citizenship with the Natchez Nation. I am an enrolled Natchez Citizen, as and as well with the Cherokee Nation. I am half Indigenous/Native American.

2)  THAT, by way of Education, I have attained a Masters degree in Social Work and am Tribally Licensed and remain eligible for State Licensure. Further that I was, for some time, employed by Three Feathers Associates (TFA) and herein also referred to as TFA), a nationally known Native American consulting firm. During my tenure at TFA I participated as a trainer for several national training programs, one of which was for the INDIAN CHILD WELFARE ACT. I co-wrote and titled the Indian Child Welfare Orientation and Resource Manual (i.e. literally "the book") on Indian Child Welfare. Our department was asked to edit and critique proposed amendments to the Indian Child Welfare Act. I also worked in a TFA program providing family court services to the 18 tribes of Western Oklahoma, reviewing, testifying and initiating Indian Court action on hundreds and hundreds of cases under that purview. I was also a Senior Triage Specialist with the Oklahoma Department of Mental Health and Substance abuse Services for nearly six years; also evaluating the need for emergency temporary inpatient mental health services.

3)  THAT I was the author of The Comprehensive Juvenile and Family Codes of the Muscogee Nation, NCA92-119, signed into law by Principal Chief Bill Sunday Fife on the seventh day of October, 1992. As the administrator for their Children and Family Services Administration, I was responsible for its implementation and the provision of all children and family services furnished there.

4)  THAT all of the aforesaid information can be verified by way of written documentation.

Exhibit 4B

FILED
IN THE TRADITIONAL COURT
OF THE NATCHEZ NATION

5) THAT it is the purpose of the Indian Child Welfare Act to reaffirm jurisdiction of Indian Tribes regarding child welfare cases and to allow transfer to tribal court without good cause to the contrary.

6) THAT It is understandable and highly commendable that your Court would wish to allow a child reasonable access to appropriate care, counseling and education.  It must be stated, however, that the children and/or family may have been inappropriately investigated and/or mismanaged with regard to the care of the children. The children should have been allowed access to Native American services.

7) The State of California has heretofore not been especially cognizant of the needs of Native children.  Both girls need to be reacquainted with her Natchez heritage as well as have continued contact with their biological extended family. The Natchez Nation in Oklahoma have many adherents to those traditions in which I take a leading role.

8) THAT, therefore, it is likely that placement back in the home with parents, grandparents and/or other extended family is the most positive for the children.  The "best interests of the children" are better served in this particular matter through cooperation of tribal and state resources.  The simple act of enrollment in a federally recognized tribe does not afford the girls knowledge of Native medicine and culture.  This can be accessed by the biological family at their own behest.

9) THAT I can conduct an assessment of the children's family resources and needs.  I am provide psychological ... at this point, however, that the children would be better served IN THE HOME, rather than have to deal with further separation and trauma.

10) If the state workers in this case should continue to block the children's return at least to an extended family home it will become necessary for the Natchez Nation to transfer the case to their jurisdiction.  There is no justification to keep the case within a state's jurisdiction.

11) Should you require additional information, I will be available to your court and can be contacted nearly any time day or night.

Kent T. "Hutke" Fields, BASW, MSW, LRSWS
Uvcenv Cunv Uvsel, Principal Chief/CFSA Supervisor
The Sovereign Natchez Nation



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT "5"

MOTION TO INTERVENE AND MEMORANDUM OF POINTS AND AUTHORITIES REGARDING
NATCHEZ NATION ELIGIBILITY TO INTERVENE AND TRIBAL JURISDICTION IN THE CASE OF THE
MINORSDATE: AUGUST 10, 2021TIME: 8:30 A.M.DEPT: 421

EXHIBIT 5

 **THE MUSCOGEE NATION**

DAVID W. HILL
PRINCIPAL CHIEF

DEL BEAVER
SECOND CHIEF

Children and Family Services Administration
P.O. Box 580 | Okmulgee, OK 74447
T 918.732.7869 | F 918.732.7854

Date: 8/5/2021

*The Law offices of Thomasina Reed*

Hello, I could find no record of Iyanna Elizabeth Ebow, Na'siya Sereen Ebow, Ian Ebow, or Amanda Sue Turner in our digital case management system. All demographic information from cases received are logged into our case management system. There is a possibility that it is in our physical storage. If record of these individuals is found, I will contact you immediately.

We appreciate your attention to the provisions of the Federal Indian Child Welfare Act. If you need additional information, please feel free to contact me at (918) 732-7869.

Respectfully Submitted,

Johnny Childress
Intake Specialist
Muscogee (Creek) Nation
Children and Family Services

THE MUSCOGEE NATION
918.732.7600 | 800.482.1979 | MuscogeeNation.com

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT "6"

MOTION TO INTERVENE AND MEMORANDUM OF POINTS AND AUTHORITIES REGARDING
NATCHEZ NATION ELIGIBILITY TO INTERVENE AND TRIBAL JURISDICTION IN THE CASE OF THE
MINORSDATE: AUGUST 10, 2021TIME: 8:30 A.M.DEPT: 421

Exhibit 6

# INDIAN AFFAIRS.

---

# LAWS AND TREATIES.

---

### Vol. II.
### (TREATIES.)

---

COMPILED AND EDITED
—BY—
CHARLES J. KAPPLER, LL. M.,
CLERK TO THE SENATE COMMITTEE
ON INDIAN AFFAIRS.

WASHINGTON:
GOVERNMENT PRINTING OFFICE.
1904.

TREATY WITH THE CREEKS, 1790.                           25

## SEPARATE ARTICLE.

Should a robbery or murder be committed by an Indian or Indians of the Six Nations, upon the citizens or subjects of the United States, or by the citizens or subjects of the United States, or any of them, upon any of the Indians of the said nations, the parties accused of the same shall be tried, and if found guilty, be punished according to the laws of the state, or of the territory of the United States, as the case may be, where the same was committed.  And should any horses be stolen, either by the Indians of the said nations, from the citizens or subjects of the United States, or any of them, or by any of the said citizens or subjects from any of the said Indians, they may be reclaimed into whose possession soever they may have come; and, upon due proof, shall be restored, any sale in open market notwithstanding; and the persons convicted shall be punished with the utmost severity the laws will admit.  And the said nations engage to deliver the persons that may be accused, of their nations, of either of the beforementioned crimes, at the nearest post of the United States, if the crime was committed within the territory of the United States; or to the civil authority of the state, if it shall have happened within any of the United States.

*Robberies and murders to be punished according to the law, etc.*

*Stolen horses to be restored.*

*Offenders to be delivered up.*

Ar. St. Clair.

---

## TREATY WITH THE CREEKS, 1790.

*A Treaty of Peace and Friendship made and concluded between the President of the United States of America, on the Part and Behalf of the said States, and the undersigned Kings, Chiefs and Warriors of the Creek Nation of Indians, on the Part and Behalf of the said Nation.*

*Aug. 7, 1790.*

*7 Stat., 35.
Proclamation, Aug. 13, 1790.*

THE parties being desirous of establishing permanent peace and friendship between the United States and the said Creek Nation, and the citizens and members thereof, and to remove the causes of war by ascertaining their limits, and making other necessary, just and friendly arrangements: The President of the United States, by Henry Knox, Secretary for the Department of War, whom he hath constituted with full powers for these purposes, by and with the advice and consent of the Senate of the United States, and the Creek Nation, by the undersigned Kings, Chiefs and Warriors, representing the said nation, have agreed to the following articles.

### ARTICLE I.

There shall be perpetual peace and friendship between all the citizens of the United States of America, and all the individuals, towns and tribes of the Upper, Middle and Lower Creeks and Semanolies composing the Creek nation of Indians.

*Peace and friendship perpetual.*

### ARTICLE II.

The undersigned Kings, Chiefs and Warriors, for themselves and all parts of the Creek Nation within the limits of the United States, do acknowledge themselves, and the said parts of the Creek nation, to be under the protection of the United States of America, and of no other sovereign whosoever; and they also stipulate that the said Creek Nation will not hold any treaty with an individual State, or with individuals of any State.

*Indians acknowledge protection of United States.*